## Commonwealth *v.* Beard, Appellant.

*Criminal law—Conspiracy—Trial.*

1. On the trial of an indictment for conspiracy where it appears that there are four defendants indicted, but only three on trial, the jury cannot convict the absent defendant as one of two conspirators, but it may, if the evidence so satisfy it, convict one of the defendants on trial of conspiracy with the absent one, while acquitting the other two.

*Criminal law—Trial by jury—Jury of eleven—Agreement of counsel.*

2. Where, during the course of a criminal trial, one of the jurors becomes ill and by agreement of the commonwealth and defendant the trial is continued with eleven jurors only, who return a verdict of guilty, without objection or exception taken at the time, and without any motion in arrest of judgment, the appellate court will not set aside the verdict because it was rendered by eleven jurors instead of twelve.

Argued Oct. 2, 1911. Appeal, No. 80, Oct. T., 1911, by Elmer H. Beard, from judgment of Q. S. Berks Co., June Term, 1910, No. 32, on verdict of guilty in case of Commonwealth v. Elmer H. Beard, Albert H. Hawman, Penrose W. Hawman and Charles F. Smith. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD and PORTER, JJ. Affirmed.

Indictment for conspiracy. Before ENDLICH, P. J.

At the trial a juror became ill, and was excused. By agreement between the commonwealth and defendants the trial was continued with eleven jurors only.

Defendant presented the following points, all of which were refused:

1. That the evidence is not sufficient to warrant his conviction. [5]

2. That there can be no conviction in this case unless the jury find from the evidence that there was an actual and intentional scheme to defraud the city in which the engineers, or one of them, and the Hawmans, or one of them, co-operated. [6]

3. That though the jury may find that the engineers or either of them were at fault in not keeping proper notes or in mistakes of calculation or mistake of judgment, or were careless in what they did, or were ignorant of what they should have known or were even partial to the Hawmans, there can be no conviction on such account unless the jury also finds that such conduct was because of a willful intent to defraud the city and that the Hawmans, or one of them, were implicated in the misconduct. [7]

Verdict of guilty, upon which judgment of sentence was passed.

ENDLICH, P. J., filed the following opinion:

A very careful consideration of this record has led to the conclusion that the verdict cannot properly be disturbed.

1. The charge upon which the defendants were indicted is conspiracy. After the jury had been sworn and the trial gone on for two and a half days, the commonwealth's case in chief and a considerable portion of defendant's evidence being in, one of the jurors was taken ill. By consent of both sides he was excused, "the trial to proceed with the remaining eleven." It so proceeded and resulted in a verdict of conviction. There was no objection to the reception or recording of that verdict. Rule XLI, sec. 1, of the rules of this court, requires applications for arrest of judgment and for new trials to be made and the reasons therefor to be filed within four days after verdict. There was no motion in arrest of judgment. But within the prescribed period a motion for a new trial was made, reasons filed in support of it and this rule entered. No point was made in them impugning the validity of the verdict because rendered by less than twelve jurors. Four months later, without allowance by the court, an additional reason was filed making this objection. It is true that to the original statement of their reasons defendants add that they "reserve the right to specify further reasons when the stenographer's notes shall have been transcribed and filed."

If good for anything, this reservation could admit only such additional reasons as required for their statement access to the notes of testimony, not one which, if available at all, was fully within the defendants' knowledge and perfectly capable of assignment without them. But a reservation contrary to the rule is impossible. Requiring the filing within four days of "the" reasons for a new trial, it of course means "all the" reasons; see Bakes v. Reese, 150 Pa. 44, 46; Eckert v. Trust Co., 212 Pa. 372, 375. It may be legitimate enough, in assigning reasons in support of an application for a new trial, to reserve the right of more specifically stating those assigned when there is no possibility of stating them in any but a general way before the transcription of the evidence; but there can be no reservation of a right to file additional new reasons after the expiration of the period allowed by the rule, without special leave. It might be enough to dismiss this objection to the verdict as not legitimately raised. But it is unnecessary and possibly unadvisable to do so.

The general subject of the power of one charged with crime to bind himself by a waiver of constitutional rights was before this court in Com. v. Fritch, 9 Pa. C. C. Rep. 164, a prosecution for larceny in which, after the jury had been sworn, the defendant had agreed to the withdrawal of one of the jurors and the substitution of another, whereby, it was contended after conviction and perhaps logically enough under certain decisions, that he was put a second time in jeopardy, contrary to the explicit prohibition of art. I, sec. 10, of the constitution. He was held competent to waive it and to have waived it, and his conviction was sustained. On the precise question here arising there are no binding authorities in Pennsylvania. In Com. v. Shaw, 1 Pitts. 492, and Com. v. Byers, 5 Pa. C. C. Rep. 295, it was held that one accused of crime could not be tried by eleven jurors even with his consent. In Com. v. Sweet, 4 Pa. Dist. Rep. 136, the contrary was decided. In Lavery v. Com., 101 Pa. 560, it was held that an accused had effectually waived his right of trial by a jury of twelve

in the quarter sessions by consenting to be tried, under a statute, by a jury of six before a magistrate. It is declared in Com. v. Sweet, 4 Pa. Dist. Rep. 136, 139, that, if the objection is one founded upon a constitutional requirement incapable of being waived by the accused without a statute authorizing him to do so, it "will require something more effective than an act of assembly to overcome it," and there are observations in other very respectable decisions looking the same way. Still, in view of the remark in Mansfield's Case, 22 Pa. Superior Ct. 224, 235, and the circumstance that the existence of a statute providing for waiver of trial by jury has been referred to in several cases as an element in the decision: State v. Worden, 46 Conn. 349; In re Staff, 63 Wis. 285 (23 N. W. Repr. 587); State v. Mansfield, 41 Mo. 470; State v. Wells, 69 Kan. 792 (77 Pac. Repr. 547); Logan v. State, 86 Ga. 266 (12 S. E. Repr. 406); Moore v. State, 22 Tex. App. 117 (2 S. W. Repr. 634) and see Jennings v. State, 134 Wis. 307 (114 N. W. Repr. 492), it seems expedient to treat Lavery v. Com., 101 Pa. 560, as not in point. But, though we have no settled rule of our own to apply, it would be an affectation to attempt to reach a conclusion by discussing the question as a new one and to reason it out ab ovo. That work has been thoroughly done elsewhere on both sides of it. The majority of the cases in which it has been done are collated and commented upon by the four judges who divided on the question in State v. Cottrill, 31 W. Va. 162 (6 S. E. Repr. 428). The conflict is irreconcilable. All that remains at this day is to follow those of the decisions whose reasons commend themselves as the better ones and whose spirit is congenial to the policy and spirit of our own law: see Valjago v. Steel Co., 226 Pa. 514, 522. That those are thus eliminated which treat a person on trial for crime as unfree to waive any right or advantage is very clear from the decisions in Lynch v. Com., 88 Pa. 189; Com. v. Weber, 167 Pa. 153, and many others. The same is to be said of those in which a stress is laid upon technical regularity not in harmony with the rule in this state that

the day of mere technicality is past: Brown v. Com., 78 Pa. 122, 127. Nor does there appear to be much deference due to the denial of an accused's competency to assent to the excuse of one of the jurors duly impaneled, etc., upon speculation as to what the recognition of such right may be supposed to involve in the way of setting aside all the lawfully appointed forms of procedure, reducing the jury to ten or six or one, negotiating in advance for the penalty to be imposed, and so on—forgetting that, as pointed out in Com. v. Dailey, 66 Mass. 80, 83, nothing can take place without the permission of the court, and that no court would sanction anything extravagant or unreasonable, nor, except upon an unforeseen and urgent exigency, any departure from established forms. Apparently more weighty is the thought advanced in some of the decisions, notably in Thompson v. Utah, 170 U. S. 343 (18 Sup. Ct. Repr. 620), in line with Cancemi v. People, 18 N. Y. 128, 136–138, that the community has an interest in the life and liberty of every person on trial and in seeing that all the safeguards thrown about him by the law are observed, even against his will; so that, in a prosecution for a grave felony, his failure to object to trial by a jury of eight under a statute passed ex post facto is not to be accepted as binding him to the result. But that decision, rendered by HARLAN, J., and dissented from by BREWER and PECKHAM, JJ., must be understood as at least so far modified by the later one in Schick v. U. S., 195 U. S. 65 (24 Sup. Ct. Repr. 826), rendered by BREWER, J., and dissented from by HARLAN, J. [largely upon the strength of Thompson v. Utah, 170 U. S. 343 (18 Sup. Ct. Repr. 620)], as to leave the rule announced in the latter applicable only to the kind of cases with which it dealt, felonies or the highest grades of misdemeanor. Obviously this modification robs the particular consideration referred to of much, if not all, of its significance. It surely cannot be true that the public is interested in the protection of an accused in proportion to the magnitude of his offending—that its solicitude goes out to the great offender but not to the small—

that there is a difference in point of sacredness between constitutional rights when asserted by one charged with a grave crime and when asserted by one charged with a lesser one. Hence, when it is held in Schick v. U. S., 195 U. S. 65 (24 Sup. Ct. Repr. 826), that in trials for the lowest grades of offenses the accused may waive, not only the continued presence of the full number of jurors required to make up a jury, but the right to trial by jury, the only possible conclusion is that the purely theoretical element of public concern, as potential to override the accused's own free choice and render him effectually unfree even before conviction and sentence, cannot be regarded as in reality much of a factor in any case. Lastly there is the objection suggested in Cooley, Const. Lim. (7th ed.) 458, and adopted in various decisions, that a trial with consent of the accused by a jury of less than twelve would be a trial by a tribunal unknown to the law, created by mere voluntary act of the parties—a species of arbitration, unprovided for, of the question of the accused's guilt. That this objection, if good, would logically apply with equal force to a trial and verdict in a civil case by a jury from which one had been by consent excused, so as to preclude a review on application for a new trial, etc., is very manifest. Granted that under constitutional and statutory provisions in civil cases a jury may be wholly dispensed with, and they may be taken out of court by reference to arbitration, yet if they are not so disposed of, if they are brought to trial before a jury, it is certain that numerically the latter is exactly the same as in a criminal case, and that, in the one as in the other, the integrity of its ordained composition as a constitutional tribunal for the trial of the cause is equally affected by the withdrawal of one of the jurors; and there is exactly the same reason for treating the proceeding as a species of extra-constitutional and extra-statutory arbitration before a tribunal unknown to the law. Nevertheless every one familiar with civil practice knows that just that thing is constantly done without doubt of its competency or thought of ensuing difficulty.

Its legitimacy, indeed, affirmed in Raleigh & Gaston R. R. Co. v. Bradshaw, 113 Ga. 862 (39 S. E. Repr. 555), and Rindskopf v. State, 34 Wis. 217 (a quasi criminal proceeding for bastardy), does not seem ever to have been mooted in our courts; a circumstance, according to Smith v. Com., 54 Pa. 209, 214, which is evidence of its lawfulness. · But, properly speaking, neither in a civil nor in a criminal case, does the defendant by agreeing to go on before eleven jurors create or submit himself to a new tribunal.   That would raise a question of jurisdiction similar perhaps to that arising in Com. v. Collom, 1 Pa. Superior Ct. 542, upon which the consent of the defendant would amount to nothing.   But in the case supposed the presence of any question of jurisdiction is implicitly negatived by the language of Com. v. Dailey, 66 Mass. 80, 83, quoted in Schick v. U. S., 195 U. S. 65, 72 (24 Sup. Ct. Repr. 826), that the defendant's right so to agree rests upon his power to "waive any matter of form or substance, excepting only what may relate to the jurisdiction of the court."   In truth, as appears by the best considered cases on both sides of the question, what the accused really consents to is simply not to object to an irregularity, not indeed in the original constitution of the tribunal appointed for his trial, but in the continuing composition of one of its parts, occurring, by reason of unavoidable circumstances, at a subsequent stage of the proceeding, after the jurisdiction of the tribunal had attached, and existing at the rendition and reception of the verdict.   He does so at a time and under conditions when perfectly free to choose whether so to consent or not, without any liability to prejudice by reason of a refusal to consent.   Having for reasons of his own given his consent and taken the chances of the result, he should, upon every analogy in our law and upon the most obvious grounds of good faith and justice be precluded from retracting it when disappointed in the result.

But it is needless to prolong this discussion.   As abundantly meeting every objection here urged it is enough to

refer to the lucid and sagacious, as well as learned and convincing opinion of Chief Justice SHAW in Com. v. Dailey, 66 Mass. 80, a case of conspiracy, where it was held that the defendants' assent to the excuse of a juror for illness of his father, and to going on with the trial, forbade them to question the verdict of conviction rendered by the remaining eleven on the grounds here taken,—and to the decision in State v. Kaufman, 51 Ia. 578 (2 N. W. Repr. 275), a case of forgery, in which with the assent of the accused a juror taken ill was excused and the trial proceeded with, and the same objection was subsequently brought forward to invalidate the verdict of conviction, and overruled. Both of these decisions, as well as the similar ones in Murphy v. Com., 1 Metc. (Ky.) 365, and Tyra v. Com., 2 Metc. (Ky.) 1, are approvingly cited in Schick v. U. S., 195 U. S. 65 (24 Sup. Ct. Repr. 826), which in its turn has been recognized as recently as Mullan v. U. S., 212 U. S. 516, 519 (29 Sup. Ct. Repr. 330). To these may be added State v. Grossheim, 79 Ia. 75 (44 N. W. Repr. 541), a prosecution for attempted rape, in which the doctrine of State v. Kaufman, 51 Ia. 578 (2 N. W. Repr. 275), was reiterated,—State v. Sackett, 39 Minn. 69 (38 N. W. Repr. 773), a prosecution for assault and battery,—and cases in other jurisdictions cited in those mentioned. If it be true that numerically those preponderate in which the right of waiver has for one reason or another been denied, it is very confidently believed that those affirming it have the better of the argument, are more in accord with rational modern views of legal procedure, conform alike to ordinary notions and to the highest practical standards of right and fairness, and fall in readily with the common sense way in which the law of this state deals with questions not backed by actual and substantial as opposed to abstract and technical merit. It may also be noted that among the cases cited on behalf of the defendants, in so far as they have been found accessible, some simply negative the right of the accused to waive a jury altogether and submit himself to trial by the court alone,—

a proposition going much further than any here involved; and of the rest all but two in Wisconsin relate to prosecutions for felonies, including murder, or infamous crimes just short of felony. There may perhaps be no sufficient ground for differentiation on that basis. Certain decisions on both sides so declare. Nevertheless there are, on both, decisions to the contrary: see Schick v. U. S., 195 U. S. 65, 71, 72 (24 Sup. Ct. Repr. 826), and State v. Mansfield, 41 Mo. 470, 476, and cases cited. If the distinction is a good one, clearly the negative decisions dealing with felonies are to be confined to such and not to be regarded as authority in cases of misdemeanor. In that event it may be safely said that the weight of authority is adverse to the position of defendants as taken in this case. In it we are concerned only to ascertain the rule in misdemeanors. No expression of opinion is called for beyond that. Whether the same rule is to be applied in felonies, and more particularly in capital ones, and what in such may be the reasonable and controlling considerations—all this is foreign to the question here arising. What is now decided, and all that is decided is that, taken by defendants in a prosecution for a mere misdemeanor, their position is untenable.

2. It is next contended that the indictment charges an executed conspiracy by means of which the city of Reading was actually put to loss, and that this precise charge cannot be sustained because the city, though it has overpaid the contractors from time to time, still has in hand funds coming to them sufficient to reimburse itself. Passing by the question whether this contention consists with the proper understanding of the nature of a prosecution for conspiracy as indicated in such cases as Hazen v. Com., 23 Pa. 355; Com. v. Richardson, 42 Pa. Superior Ct. 337; Com. v. McGowan, 2 Pars. 341, and assuming the fact to be as alleged, yet the consequence insisted upon would by no means follow. The contractors were paid upon periodical estimates of the work done by them. If, in pursuance of a conspiracy between them and the city engineer

to defraud the city, at any of these periods a sum was certified as due which was not rightfully due, and was paid by the city, the conspiracy was to that extent carried into effect. The circumstance that, at the time, the city may have had in hand a greater sum, retained by way of percentages not payable to the contractors until months after the completion and acceptance of the construction and liable to deductions for stipulated purposes, has no more to do with the question, than would have its ability by action to recover the overpayments made to the contractors, wholly immaterial under Com. v. Drum, 42 Pa. Superior Ct. 156, 164. The fraudulent purpose was complete when the estimate was certified, and it was executed when under it the amount not due was paid and received as due. The contrary here contended for would involve the solecism that a fraud deliberately designed and actually realized is not to be deemed a fraud if the party imposed upon is in a position to hold the wrongdoer to restitution. The same sort of reasoning might be invoked in behalf of one who burglarized a bank in which he had a deposit, or picked the pocket of his debtor. It might indeed involve the further objectionable result that a fraud thus conceived and carried out in the course of the performance of a contract extending over a considerable period would be incapable of redress by prosecution if the completion of the entire work and the final settlement could be postponed for more than two years after the formation and consummation of the conspiracy, although it would then appear that the guilty parties had at the time succeeded in extracting from the city amounts not due them exceeding in the aggregate the portion of the percentages retained by the city available for its reimbursement. See Com. v. Bartilson, 85 Pa. 482.

But aside from all this, the assumption that the city has not been shown to be out of pocket cannot be assented to. The case was submitted to the jury as one requiring that fact to be established in order to warrant a conviction. The verdict, therefore, affirms it as a fact: Smith v.

Shields, 194 Pa. 635; Kaechele v. Traction Co., 15 Pa. Superior Ct. 73, 76. Now without stopping to detail here the evidence and figures which will have to be adverted to later on, it may be observed that the effect of those of the commonwealth, if believed, was to cut down not only the quantum of excavations and concreting specified in the estimates attacked as fraudulent and the allowances for such made therein, but also their calculations of the amount retained by way of percentages, etc., and still in the hands of the city. Under the commonwealth's evidence concerning these items, if accepted as accurate or approximately accurate, there is room for the inference that by the payment to the contractors of the $8,306.32 certified in the estimate of March 3, 1909, to be due to them, the city paid them an amount ranging up to $10,514, and more, over and above all that had then become justly payable by it, plus the retained percentage thereon. If this be true, then, in the event of a conclusion that there was a conspiracy to defraud the city, that conspiracy was executed by subjecting the city to a loss exceeding any sum retained and eventually to be accounted for by it. So that, putting the strictest possible construction upon the indictment, holding the prosecution to proof that the city was actually injured, and conceding that in so determining it was necessary to deduct from the aggregate payments to the contractors the sums (rightly figured) still held by the city, a finding against the defendants cannot on these grounds be declared unsustainable.

3. Finally, it is urged that the evidence does not warrant a finding that there was a conspiracy. In considering that contention it will not do to conceive the inquiry as turning upon the effect of some particular circumstance in the case, or upon the probable answer to some specific subsidiary question of fact. The issue presented is the broad one of the existence upon circumstantial proof of a fraudulent conspiracy, not the narrow one whether any designated circumstance, supposed to be decisive in the minds of the jury, is established and in itself sufficient to make

out the charge. It was said in Montgomery Web Co. v. Dienelt, 133 Pa. 585, at p. 595:

"There probably never was a case of circumstantial evidence that could not be blown to the winds by taking up each item separately, and dismissing it with the conclusion that it does not prove the case. The cumulative force of many separate matters, each perhaps slight, as in the familiar bundle of twigs, constitutes the strength of circumstantial proof."

In other words, it is always possible in a case of this character to formulate certain questions, assume them to be controlling and present an analysis of the testimony bearing upon them, in such a way as to show with a degree of plausibility that, upon this question and upon that, this or that item of evidence, judged by itself, does not justify a finding adverse to the accused,—and thereupon to argue the insufficiency of the whole upon the familiar maxim ex nihilo nihil fit, or the unimpeachable mathematical rule that, adding together any number of zeros, the result will still be zero. But neither that maxim nor that rule has any application. In the case just cited, reaffirmed in Candee & Co.'s App., 191 Pa. 644, such a method of treating a charge of fraud is condemned as erroneous. And in Weil Bros. v. Cohn, 4 Pa. Superior Ct. 443, it is laid down that the existence of an alleged conspiracy is for the jury upon the aggregate, the cumulative effect of the whole evidence although each isolated item of it, taken by itself, may fall short of establishing the charge. Of course that rule obtains here; and so treating this case, we have a state of facts either undisputed or indisputably inferable, whose collective interpretation in the light of ordinary reason and experience concerning the correlation between men's actions and motives may fairly lead to the conclusion the jury drew from them—the correctness and certainty of these inferences and that conclusion being necessarily for their determination: Sulkin v. Gilbert, 218 Pa. 255, 260, as depending upon the credibility of witnesses and upon presumptions of fact which our law refers to them ex-

clusively: Com. v. Winkelman, 12 Pa. Superior Ct. 497,
513; Phila. Trust Co. v. R. R. Co., 160 Pa. 590, 600.

It would be impracticable and is unnecessary to rehearse
in minute detail all the matters the jury was at liberty to
accept as established by the voluminous evidence and
tending to make out, collectively and cumulatively, the
charge brought against the defendants. It is enough to
refer to its main features and to these for the most part in
general terms. The Hawmans, in November, 1907, en-
tered into a contract with the city of Reading for the con-
struction of a considerable public improvement. Beard
was the city engineer, his term running to May 1, 1909.
The contract made the city engineer the final arbiter of
every question arising in its performance and of the
amounts to be allowed and paid to the contractors from
time to time for what had been done by them under the
contract and by way of extras. He was required by or-
dinance to make field notes, to preserve them and keep
them in his office for reference and to be turned over to
his successor. He put his assistant Smith in immediate
charge of the construction. Beard swears with positive-
ness and circumstantiality that he directed Smith to keep
field notes, knew that he kept them, had them exhibited
to him from time to time, "checked up" the working pro-
file by them, made his calculations from them or with their
aid, and demanded them from Smith after the completion
of the work, but did not get them. Beard swears with
equal positiveness that he did not direct Smith to keep
field notes, never saw any, directed Smith merely to keep
a working profile, considered that sufficient, himself con-
sulted nothing else and made his calculations without the
aid of any other papers. Smith, in an affidavit offered in
evidence by defendants, deposes that Beard directed him
to keep a working profile, not field notes, and that he
turned over to Beard all the papers he had kept. Certain
it is that no field notes are to be found. It is true that
some of the experts called by defendants testify that the
requirement to keep field notes may be regarded as met

by the keeping of a working profile, and that the latter may supply all the data necessary to make correct and full calculations of the work done. But on the one hand, a mere inspection of the working profile shows that this cannot be true; and "neither a judge nor a juror is found to accept the statement of a witness that contradicts the testimony of his own senses:" Com. v. Jongrass, 181 Pa. 172, 175. And on the other hand, the statement in question is not only opposed by direct testimony to the contrary, but virtually nullified by the evidence of Beard himself, who, in explanation of the excess of his allowances over what appears by the profile, repeatedly declares that he had to make allowances for width and depth of excavations, etc., which in the nature of things could not possibly appear upon the profile, incapable, as he testifies, even of showing the actual depth of excavation, etc., at any point, but indicating only average depths from station to station, twenty feet apart. At the inception of the work the Hawmans made some notes, but soon ceased doing so and destroyed what they had. As the work went on, the Hawmans depended entirely upon Beard to take care of them, and received from the city payments in accordance with estimates made up by him upon the basis of the working profile, plus allowances as testing the correctness of which no records or data of any kind were preserved. In the meanwhile, certain minor changes in the plans were found expedient, involving the omission of work contemplated by the contract and the doing of other not contemplated by it. In such cases Beard allowed the Hawmans both for what they were relieved from doing and for what they did in the way of departures from the original plans; and this in many instances without or greatly in excess of previous written orders required by the contract in respect to extra work, and generally without disclosing the details and items of the same and of his allowances to the board of public works when obtaining their approval. His action upon debatable points was uniformly adverse to the city and favorable to the contractors. On March 3, 1909, the

work being then substantially completed, he certified to
the total of excavation as 50,517 cubic yards ($21,217.14)
and to that of concreting as 5,270 cubic yards of 1–3–6 at
$4.58 per yard ($24,136.60)—6,045 cubic yards of 1–2½–5
at $4.74 per yard ($28,653.30)—and 3,545 cubic yards of
1–2–4 at $5.71 per yard ($20,241.95). According to this
certificate and upon this basis the whole sum earned by
the contractors for work covered by the contract was
stated as $107,929.34, of which fifteen per cent ($16,189.40)
were to be retained by the city, leaving $91,739.94. To this
was added for extras $12,000.63, making $103,740.57, de-
ducting therefrom the sum of $95,434.25 previously paid
to the contractors. Beard certified as then due them
$8,306.32, which amount they received. A "final" es-
timate made and certified by him on April 21, 1909,
stated the 1–3–6 concrete work as 8,198 cubic yards
($37,546.84),—the 1–2½–5 as 4,872 cubic yards
($23,093.28),—and the 1–2–4 as 3,845 cubic yards
($21,954.95),—the total earned by the contractors under
the contract, less $18.004.78 retained percentage, as
$102,027.14, increased by $18,024.18 for extras to $120,051
and deducting therefrom $103,740.57 already paid, the
balance due them as $16,310.70. The correctness of this
and the previous estimate being drawn in question by the
board of public works, Beard after the expiration of his
term as city engineer was induced to go over the "final"
estimate again, and about the beginning of July made a
"revised" one, dating it April 21, 1909, giving the 1–3–6
concrete as 7,504 cubic yards ($34,368.32), the 1–2½–5
as 4,304.08 cubic yards ($20,404.75), the 1–2–4 as 3,839.4
cubic yards ($21,922.97), and the balance due the con-
tractors as $11,206.53,—thus admitting an excess allow-
ance to them previously of 1,268 cubic yards of concrete
and an overcharge therefor against the city of $5,899.03.
No explanation has been offered for the discrepancies
pointed out. Even thus reduced, however, the estimates
and allowances made by Beard rested only in part upon
what appeared by the sole record kept, the working pro-

file, and were irreconcilable with what there appeared with respect to the 1–3–6 and the 1–2½–5 concreting. The 1–2–4 concrete work was all above ground, and it is to be noted that the remeasurements of it disclosed no overallowances. The other concrete work was underground. In order to get as nearly as possible to the actual amount of it the city made a series of some ninety-five borings and excavations along the construction. Wherever practicable they were made on opposite sides of the walls, so as to obtain the depth of them on both sides and their breadth and thus to obtain data whereby to calculate the volume of concrete under ground. Where it was impossible to make them in the way indicated Beard's figures were accepted by the city in making the calculations. They put the total of 1–3–6 concrete at about 3,302 cubic yards ($15,124), of 1–2½–5 at 2,820 cubic yards ($13,367). Of course the total of excavations for the reception of the concrete is correspondingly reduced, the difference amounting to at least 4,489 cubic yards ($1,885). Upon this footing the excess charge against the city in the March certificate on the 1–3–6 and 1–2½–5 concrete would run up to $26,183,—not to mention the still greater excess appearing by the "final" and "revised" estimates. But it is not pretended on the part of the commonwealth that the measurements and calculations of its witnesses are to be taken as accurately fixing the precise number of yards of excavation and concreting for which and for which alone the contractors were entitled to be paid. It was offered as showing by a reasonable approximation of the totals involved that the allowances made by Beard and received by the contractors, discredited as they were by Beard's own variations, were of necessity grossly wrong,—the exact figures being for the purposes of this case of very little if any consequence. It was, to be sure, testified by certain experts called by defendants that the tests made by the city, in the manner described, were "inaccurate," "unreliable," "unfair," "worthless," etc., and the results predicated upon them a "mere guess." They did not in-

dicate any feasible better method. At all events, the credibility of their testimony was for the jury; and if the latter, exercising their own judgment and reasoning powers, declined to accept that testimony from witnesses many of whom had declared that the working profile contained a complete record of that which the jury could see for itself it did not contain and the absence of which from it, insisted upon by Beard himself, forms the very groundwork of the defense in this case (i. e., innocent mistakes of calculation in matters not apparent by the profile)—who shall say that they erred in so declining? Nor can it be successfully alleged that the evidence of the tests made by the city was not admissible. If relevant to an issue trying, the controlling consideration as to the admission of any proposed kind of evidence, according to Chief Justice TILGHMAN, in Garwood v. Dennis, 4 Binn. 314, 326 (and see also Com. v. Drum, 42 Pa. Superior Ct. 156, 167), is necessity. In the nature of things it is impossible accurately to measure the cubical contents of a great irregularly shaped mass of underground concrete in place. The best that can be done is what was here done to approximate it. The objection that the result lacks absolute precision can come with but ill grace from those who had it in their power, and from one whose duty it was to make and preserve accurate records or memoranda, and who deliberately abstained from doing so. As far as they go, the evidence of and the calculations based upon these tests were clearly helpful. Indeed, the only ground upon which their competency to furnish a very close approximation of the amount of the work done can be disputed is the assertion that the construction was upon a species of rock in which many fissures or pockets occurred which had to be filled up with concrete so as to provide a solid foundation, and that the city's tests could not disclose these. The answer is that, in the commonwealth's calculations referring to the points where, according to the evidence, the principal difficulties of this sort occurred, the figures of the defendants were accepted as correct, and that at the

points where measurements were made and taken as the basis of calculations the holes drilled or excavations made went to the bottom of the concrete. Of course, the value of these tests and calculations (the substantial correctness of which upon the basis whereon they were made is not impugned) was for the jury, and they were submitted to it with caution. Possibly if they stood alone as evidence of excessive allowances, they might be regarded as open to the criticism of inconclusiveness. But they do not stand alone. There is in support of this evidence the testimony of at least one witness who had abundant opportunity for observation and was well qualified to make it as to the average depth of the excavations, allowing for the fissures, etc.; and if it be objected that he did not measure these, it must be remembered that neither did Beard, as he himself admits, though he made the allowances for them. And besides this there is strong corroboration of it in a portion of defendants' evidence in connection with certain testimony elicited from one of their witnesses. The affidavit of Beard's assistant puts the proportion in which the underground construction was cyclopean at about fifty per cent. There is, to be sure, testimony that it was very much greater. But that testimony, in view of the statement of defendants' experts as to the limits within which that method of construction may be properly adopted and the fact admitted on all hands that the work was properly executed, may have appeared to the jury incredible. At all events, the assistant engineer in constant touch with it would ordinarily be most likely to be correct on this point, and the acceptance of his statement, offered by defendants, can hardly be objected to by them. According to the evidence elicited from one of the defendants' expert witnesses, it would have required 10,763 barrels of cement for the amount and character of the entire concrete work as estimated by defendants, allowing for fifty per cent of cyclopean construction. The contractors declare they had on hand and bought and used altogether 8,132½ barrels,

and admit that of them 600 barrels were used for sidewalks, curbing, plaster-coating, etc.   If, as they further say, one barrel of cement makes one cubic yard of concreting, it is thus demonstrated that there must have been 3,231 cubic yards of concrete work less in the entire construction than what they were allowed for by Beard,— a difference which, at the average price per cubic yard under the contract, involves an overcharge against the city, in the matter of concrete alone, of more than $15,000.

There would thus appear to be no escape from holding that, in the particulars specified in the indictment, the jury was entitled to find the city to have been grossly imposed upon.   They were, however, instructed that this circumstance, if found by them, was not decisive; that overallowance by mistake due to carelessness, neglect, ignorance, or by fraud on the part of Beard alone, in short by anything except willful intent to defraud the city jointly entertained and acted upon by at least two of the defendants must go for nothing; and that there could be no conviction, unless, giving the defendants the benefit of every reasonable doubt, the jury found it impossible to account for the state of facts as they should find it to be on a theory not involving knowledge and intent and consistent with innocence, but were brought to the conclusion that they were due to fraud and willful deception on the part of Beard shared in by the contractors and attempted and realized by their conscious aid in pursuance of a common scheme looking to that end.

It can hardly be seriously contended that as a matter of law upon this record it is to be declared that Beard was unaware of the unfairness of his actions towards the city and that he did not mean to favor the contractors at its expense.   He swears that he believed and still believes his estimates of March and April, 1909, to be correct.   But it was for the jury to say what weight could be attached to that declaration in the light of his "revised" estimate in July admitting an error to the extent of nearly $6,000 without any explanation accounting for it.   For the jury

also were his bearing before them on the stand, his shifting and inconsistent testimony, its contradiction by his assistant and by other witnesses as well as by the force of undisputed circumstances in the case, his neglect to provide the positive and reliable records required alike by ordinance and by good engineering practice for testing the amount of work done by the contractors and the propriety of allowances made by him to them, his failure to disclose to the board of public works the items and details of the allowances for which he sought their approval, the magnitude of the overallowances made by him for concrete work, the fact that these occurred exclusively in underground work which could not be remeasured whilst in the work above ground which could be, no errors were made, his unvarying practice of favoring the contractors at every opportunity even to the allowance in departures from the plans of double pay. In short, it was plainly for the jury to say whether his acts were to be accounted for on the ground of accidental mistake, or of carelessness, or of ignorance, or of willful fraud.

And so, as regards the contractors, it was for the jury to say whether they were conscious or unconscious of the fact that they were receiving payment for work they had never done. It was for the jury to consider whether they were or were not aware of it when, as already mentioned, they were paid both for what they did and for what they were relieved from doing, and whether their accounts for materials and wages were or were not bound to apprise them of the excessiveness of Beard's allowances for excavations and concreting. If this were a civil case, they would, under the doctrine of Franklin Fire Ins. Co. v. Bradford, 201 Pa. 32, 37, be affected with a conclusive legal presumption that they knew the details of their own business. Arising in a criminal case, the question becomes one of actual knowledge to be inferred by the jury as a fact from the circumstances. That knowledge, however, if inferred, was necessarily a knowledge that the basis upon which allowances were made to them by Beard in-

volved misrepresentations of fact. Whatever their conception of his authority under the contract, they must have known that by no stretch of it could he make that a fact which was not a fact, make the actual amount of work done by them anything different from what in truth it was. That his power and willingness by misstatement of the facts to favor them at the expense of the city could justify them, in law or in morals, in profiting thereby is a doctrine which cannot, of course, be entertained for a moment. On the contrary, they were held to recognize his obligation to act with fairness and good faith as between him and the city: Com. v. Sanderson, 40 Pa. Superior Ct. 416, 469. If knowing that clerical or negligent errors were being committed by him, of which he was ignorant, the contractors deliberately took advantage of them, they were guilty of fraud in so doing: Com. v. Sanderson, 40 Pa. Superior Ct. 416, 469. If, believing that the city engineer was knowingly and intentionally misusing his power for their benefit to the injury of the city, they accepted the results of his wrongdoing, they were equally guilty of fraud: Com. v. Sanderson, 40 Pa. Superior Ct. 416, 470. Nor, as characterizing their attitude, is the evidence to be overlooked, which the jury was at liberty to believe, that when, after July, 1909, a certain excess allowance to them for 160 cubic yards of concreting was discovered, they requested the city official speaking to them of it to say nothing about it.

If, however, the jury, as they might, believed that Beard knew he was wronging the city and the contractors also knew it, so that both were guilty of and participants in a fraud, the inference of a conspiracy between them to effectuate it was certainly a permissible one. To instance but one feature of the case,—the opportunities and perils to the contractors of the city engineer's position under the contract as final arbiter of all questions arising can hardly have been undervalued or misunderstood by them. Whether dealing with him at arm's length or confidentially, so long as there was no wrongful understanding

between them, obviously and naturally the contractors' interest would prompt them to protect themselves against mistakes upon his part to their disadvantage by keeping notes of their own. The possibility of the occurrence of such mistakes could not, upon that assumption, be deemed excluded; nor could it be supposed that, if they occurred, the city engineer, though clothed with the power of decision, would arbitrarily refuse to correct, if furnished with reliable data establishing, them. In this view the fact that the Hawmans started out to make notes of the work done by them is as significant as their abandonment of that precaution, their destruction of those they had made, and their subsequent unconcern about and implicit reliance upon Beard's action, though largely based upon data and estimates and calculations incapable of being verified by any records preserved on either side. No less significant would appear the uniformity of Beard's practice in favoring the contractors, and their equally uniform readiness to take the fruits of his favor. The law, says Lord Brougham in Warner v. Armstrong, 3 My. & K. 45, sees things as ordinary men do. It may strike the ordinary mind that the conscience of a normal person, not committed to a scheme of fraud designed to be consummated by successive and recurring acts stretching over a lengthy period, would naturally at some stage assert itself and refuse to sanction or to profit by their repetition. Hence it may have appeared to the jury, taking into account the entire evidence in the case, that the conduct of Beard on the one hand and the contractors on the other, down to the very end of the business, the "final" estimate made just before the expiration of Beard's authority, could be rationally explained only on the theory—not of their having met together and struck a formal pact to defraud the city, which it was not necessary for the commonwealth to prove: Com. v. Snyder, 40 Pa. Superior Ct. 485, 523,—but of the existence, however formed, in their minds of a common, unlawful design to that effect, entertained and understood by all of them, and a common and systematic

action on the part of all of them in pursuance of that design towards the accomplishment of the joint purpose,—in short, a conspiracy as laid in the indictment.   The inquiry whether this conclusion was the proper one, clearly and necessarily resulting from the evidence, was, it is believed, submitted to the jury with every caution and safeguard the defendants were entitled to, in a charge whose correctness in point of law and whose fairness towards the accused have not been assailed in the argument of this application.   In support of it it cannot be affirmed that anything has been shown reasonably capable of impeaching the verdict rendered by the jury as inadequately founded in the evidence, unrighteous or unjust.

The rule to show cause is discharged.

*Errors assigned* among others were (4–6) above instructions, quoting them, and (9) in proceeding with the trial with a jury of eleven men only.

*C. H. Ruhl,* for appellant.

*Harry D. Schaeffer,* district attorney, and *Henry P. Keiser,* city solicitor, for appellee.

OPINION BY RICE, P. J., November 20, 1911:

This appellant, who was the city engineer, Charles F. Smith, his assistant, and Albert H. Hawman and Penrose Hawman, a firm of contractors, were jointly indicted for an executed conspiracy to defraud the city of Reading.   Of these, all but Smith were jointly tried, and at the conclusion of the evidence they requested the court to charge that there could be no conviction in the case unless the jury should find from the evidence that there was an actual and intentional scheme to defraud the city, in which the engineers, or one of them, and the contractors, or one of them, co-operated.   The same idea was conveyed in their next point, and the refusal of these two points is made the subject of the sixth and seventh assignments of error·

The affirmance of these points would have amounted to an instruction that though the two engineers conspired to defraud the city, and did defraud the city, yet there could be no conviction of Beard, the engineer on trial, unless the contractors, or one of them, conspired with them. It is elementary law that one cannot be convicted of conspiracy unless he has been indicted for conspiracy with named persons or with persons to the jury unknown. But the indictment in the present case was so framed as to sustain a conviction of any one of the defendants on trial if the evidence warranted a finding of criminal conspiracy between him and the defendant not on trial. Neither the form of the indictment nor the nature of the conspiracy charged, nor the relation of the parties to the public improvement referred to, would have warranted the court in charging that it was essential to a conviction that at least one of the engineers and one of the contractors conspired. The true rule applicable to the case was thus stated by the learned trial judge in his charge: "I have indicated that the design must, in order to constitute a conspiracy, have been entertained in common and acted upon by two or more of the defendants. There are here indicted four defendants. Of these, three are on trial. It takes two at least to form a conspiracy. The jury cannot convict the absent defendant as one of the two; but it may, if the evidence so satisfy it, convict one of the defendants on trial of conspiracy with the absent one, while acquitting the other two." The affirmance of the two points under consideration would have been in conflict with these instructions (which are not assigned for error), and would have been erroneous in principle. Therefore, these assignments are overruled.

The questions raised by the remaining assignments of error are very elaborately and thoroughly considered and discussed in the opinion of the learned trial judge overruling the motion for new trial. We do not underestimate the importance of any of them, and particularly do we appreciate the importance of that raised by the ninth assign-

ment. But in our judgment, reached after due considera-
tion of the evidence, the able and exhaustive arguments of
counsel, and the authorities cited by them, they are cor-
rectly and adequately answered by the learned judge.
Having arrived at this conclusion, it seems to us that no
useful purpose would be subserved by amplifying or reiter-
ating in another form the reasoning of his opinion.

All of the assignments of error are overruled. The judg-
ment is affirmed, and the record is remitted to the court
of quarter sessions of Berks county with direction that
the judgment be fully carried into effect, and to that end
it is ordered that the defendant, Elmer H. Beard, forth-
with appear in that court, and that he be by that court
committed to serve and comply with such part of his sen-
tence as had not been performed at the time this appeal
was made a supersedeas.