## Commonwealth *v.* Clay, Appellant.[1]

CONCURRING OPINION BY ORLADY, J., March 12, 1914:

While I concur in sustaining the specifications of error referred to in the opinion of the majority of the court, I feel impelled to urge the reversal of this judgment for irregularities in the trial, which to my mind are more important than the guilt or innocence of these particular defendants.

It was clearly shown, and is undisputed, that during its progress and without the knowledge of the court or the defendants, the district attorney employed twelve named and seventeen unnamed detectives to shadow and trail the jurors, and that these operatives made daily written confidential reports of their work to him, which reports disclosed that "some of ·the jurors were frequently engaged in conversations with strangers and friends in public places about the case on trial;" that four of the detectives on one occasion "drank in a public saloon with one of the jurors;" that one juror would not talk about the case to the detective ·"as we were always interrupted;" that the jurors knew "they were being watched and shadowed;" that one juror, at an early stage of the trial had said to a detective: "Clay was a sure convicted man as far as he was concerned;" that one juror "was talking every night in the cigar store about the Clay case."

The defendants knew the jurors were being watched, but did not know of the character or results of this surveillance until after the verdict, and when an effort was made to ascertain the actual facts, the district attorney prevented a full disclosure of the detectives' work.

We have the record before us just as it was in the court below when the motion for a new trial was argued.

[1] For report of this case see 56 Pa. Superior Ct. 427.

Was this a fair and impartial trial as guaranteed to every defendant under our law?

Text writers and judges are quite enthusiastic in defense of our system of trial by jury. It is lauded as the palladium of our liberties; guaranteed by our constitution in all criminal trials; as said by our Supreme Court in Mix v. North American Co., 209 Pa. 636, "It has been said that the greatest object of civil government is to get twelve honest men in the jury box. If this is true, after they get there they must be kept there, hedged around not only by their own integrity, but with every precaution against evil communication which may corrupt them; and when they go into their room to deliberate upon an issue in which is involved the life, liberty or property of their fellow-men, their conduct in the discharge of such solemn duty must comport with it, else confidence in the system which is the best achievement of civilization will be lost."

In Hawkins, Pleas of the Crown, sec. 2466, the declaration is given: "The law so abhors all corruption of jurors that it prohibits everything which has the least tendency to it, what specious pretense soever it may be covered with."

Can the court say that where the jury misbehave, so that the losing party has not had a fair and impartial trial, there is no prejudice, because the court may be of opinion that the verdict is right? By no means; the losing party is not bound to accept the judgment of the court; he is entitled to the verdict of an impartial jury. When the natural tendency of what a juror does or says, or willingly listens to from others is to bias his mind, or where his misconduct evinces a prejudgment of the case, or ill will or passion against the losing party, the inference of prejudice in the true sense inevitably follows, because the verdict cannot be said to be the result of a fair trial. There is no right more sacred than the right to a fair trial. There is no wrong more grievous than the denial of that right. Where, therefore a juror

talks outside the jury room about a case pending and undecided before him he gives the clearest evidence that he is not an impartial and unbiased juror. Such discussion certainly tends to forming impressions and prejudgments not founded on evidence. .

All parties have a deep concern in keeping juries strictly in the line of duty and propriety, and when they deviate from that line, there is no longer any security against those malign, extrinsic influences which are sure to pervert and poison the streams of justice: Poole v. Railroad, 6 Fed. Repr. 844.

The duty of the district attorney is clearly defined and must be as rigidly discharged. He is a quasi judicial official. He represents the commonwealth, and the commonwealth demands no victims. It seeks justice only, equal and impartial justice, and it is as much the duty of the district attorney to see that no innocent man suffers, as it is that no guilty man escapes. Hence he should act impartially. He should present the commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not strictly legitimate. When he exceeds this limit, and in hot zeal seeks to influence them by appealing to their prejudices, he is no longer an impartial officer, but becomes a heated partisan: Com. v. Nicely, 130 Pa. 261; Com. v. Berbuis, 197 Pa. 550; Com. v. Karamerkovie, 218 Pa. 406; Com. v. Striepeke, 32 Pa. Superior Ct. 82.

This case was of great public importance, and naturally excited special public interest, as it involved the integrity of the city's management of its financial affairs.

It was the duty of the district attorney to zealously prosecute these defendants, within the lines laid down by our laws; to protect the members of the jury to the last degree from any evil influence; to discover by any lawful means at his command, any attempt to sway or corrupt them.

The plan of the district attorney in policing this jury, can be justified only on the ground, that he believed it

was necessary, under the special facts and circumstances of the case in order to secure a fair and impartial trial, but such procedure should not be for the benefit of, or to the prejudice of either defendant or the commonwealth, and just as soon as irregularities or misconduct on the part of jurors or outsiders was discovered, it became his official duty to disclose all the facts within his knowledge to the court. The employment of detectives standing by itself, was not improper, and they were doubtless properly instructed in regard to their duties; however, when the case had been on trial a short time, that officer knew from sources he had selected and had a right to believe trustworthy, as he continued in this procedure, that some of the jurors and some of his detectives had been guilty of gross improprieties in talking about the case; in drinking with each other; in declaring a fixed opinion of the guilt of the defendant. The longer such a course was followed and such a practice sanctioned, the farther away he got from a fair and impartial trial. To have the jury know that their every step and word was watched by detectives, who made report to the commonwealth during the whole month of a trial, would inevitably tend to intimidate any ordinary citizen and unfairly influence him in favor of or against such authority. Either way it was unfair and partial, and no unbiased verdict could be rendered under such influences unless the jury would know that it was in the interest of public justice to protect the jury from every and any kind of influence favoring either party. I adopt the language of Judge TILGHMAN as given nearly a century ago, in Ritchie v. Holbrooke, 7 S. & R. 457, "For my own part, where one of the parties is charged with a kind of misconduct which strikes at the root of trial by jury, and no attempt is made to explain or contradict it, I am not for being very scrupulous in weighing the evidence." The name of the detectives should have been furnished, so that all parties could have been fully examined, and all the

facts made known to the court. From what is disclosed, by the meager examination had on the rule for a new trial, the court should have for that reason alone granted a new trial. It was not a matter of discretion but was violative of fundamental rules.