# Commonwealth *v.* Clay, Appellant.

*Criminal law—Conspiracy—Evidence—Municipal contracts.*

1. Where the officers of a city attach to a municipal contract specifications different from those upon which the bids had been received, and under which less work will be required of the contractors, and before the buildings are commenced determine upon changes and invite bids for the making of such changes or additions in such a way that only the original contractors can afford to bid for the work, and thereafter a third contract is awarded to the same contractors for work which was not provided for by the cheaper specifications in the second contract, and it appears that the contractors received the entire consideration called for by each of the three contracts, and the city officials and the contractors are indicted for conspiracy, the court is bound at the trial to submit the case to the jury.

2. On the trial of an indictment for conspiracy it is error for the trial judge to charge that if the jury found that one of the defendants knew of certain things stated, did certain things, and permitted certain things to be done, such defendant would be guilty of conspiracy. Such facts may be sufficient to warrant an inference by the jury that the particular defendant was a party to the conspiracy, but the court is not warranted in declaring as a matter of law that such facts standing alone constituted the particular defendant guilty of the crime of conspiracy.

3. Where a city awards a contract for a building, and subsequently the city officials determine upon changes in the building and invite bids for the making of such changes or additions, and it appears that the person who had secured the first contract will have a decided advantage over other bidders on the second contract, the contractors who have secured the first contract cannot be held to be guilty of a criminal conspiracy by agreeing among themselves that they would take advantage of the situation and demand and receive an excessive price for the work required by the second contract, if there is no evidence to show that they had been guilty of any misrepresentation or deception.

4. On the trial of an indictment for conspiracy against city officials and a firm of municipal contractors, it is error for the court to permit the commonwealth to prove that during the period of about four years prior to the finding of the indictment for the particular conspiracy in question, one of the city officials had awarded to the contracting firm forty-two contracts for the construction of municipal buildings, while only fifteen of said contracts had during the same period been awarded to other parties, without any offer to show that there had been any

fraud, irregularity, or circumstances tending to excite suspicion in connection with the letting and execution of any one of the forty-two contracts.

*Criminal law—Conspiracy—Jury—Reading of newspapers by jurors.*

Where the defendants during the progress of a trial of an indictment for conspiracy know that jurymen are reading newspapers containing articles prejudicial to the defendants, and they do not object and do not ask for the discharge of the jury, they cannot after a verdict of guilty claim that the conviction should be set aside.

*Criminal law—Conspiracy—Misconduct of jurymen—New trial.*

Where defendants who have been convicted of conspiracy move for a new trial, and the depositions in support of the rule show that reports submitted by detectives to the district attorney contained statements that one of the jurors was talking about the case every night during the trial at a cigar store, and another of them had declared that he possessed a fixed opinion as to the guilt of one of the defendants before the case had been half tried, the trial court should permit the defendants to ascertain the name of the detectives from the proper officials in order that the detectives in question might be called upon to testify as to what the jurors had said and done.

Argued Oct. 20, 1913.   Appeals, Nos. 78, 79 and 80, by defendants, from judgment of Q. S. Phila. Co., Jan. Sessions, 1912, No. 735, on verdict of guilty in case of Commonwealth v. Henry Clay, John R. Wiggins and Willard H. Walls.   Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD and PORTER, JJ.   Reversed.

Indictment for conspiracy.   Before STAPLES, P. J., specially presiding.

At the trial the jury returned a verdict of guilty, upon which judgment of sentence was passed.

Upon a rule for a new trial STAPLES, P. J., filed the following opinion:

The substance of the offense charged in the indictment upon which the defendants above named were tried, was, that they falsely and maliciously conspired and agreed to cheat and defraud the city of Philadelphia of its moneys, etc., in the erection and con-

struction of Truck House No. 5, Sixteenth and Cathar-
ine streets, police station, fire station and garage, at
Third and Race streets, bath house at Montrose and
Darien streets, and bath house at Seventh and Lombard
streets.

In our opinion, the evidence established beyond a
reasonable doubt that the city of Philadelphia was
cheated and defrauded, that there was a conspiracy, and
that Henry Clay, John R. Wiggins and Willard H.
Walls were three of the conspirators,—and we have
said three designedly, for there may have been one or
more others and that not necessarily including Carl B.
Zilenziger.

If the criminal purpose charged as above has been
mutually ascertained and agreed upon between the
parties, the offense of conspiracy is complete. We should
therefore examine whether there was competent evi-
dence to satisfy the jury that such conspiracy was
actually entered into.

The gravamen of the conspiracy charged is that the
laws regulating advertising, bidding and the award of
contracts were evaded by tricky devices which, under
cover of an apparent conformity to their letter, were
so manipulated that a particular contractor was pro-
tected against competitive bidding and was enabled to
charge and collect fraudulent prices for his work, largely
in excess of its real value.

There is no need to dwell too long upon each of the
four cases. Perhaps the most flagrant of them all was
that of police station, fire station and garage at Third
and Race streets. The advertisement for this work
began February 25, 1910, and asked for bids on or
before March 7, 1910. Plans and specifications were
prepared and upon these the bidders based their offers
to contract. These plans and specifications provided
that the fire station should front on Race street and
that the garage should front on Florist street.

Bids were received and on March 16, 1910, they were

scheduled and the same day the award was made to John R. Wiggins & Company. On that day, too, was dated a letter written by the defendant Clay, as director of the department of public safety, to the city solicitor, in which he requested the latter to draw the contract in triplicate, the letter being accompanied by three copies of the specifications to be attached thereto. This letter reached the city solicitor on March 28. He prepared a contract dated March 30, 1910, and this contract was signed by the mayor on April 7, 1910.

It appears that the plans and specifications on which the bids were taken and the award made, were subsequently modified and that these modifications reduced the value of the work by about $20,000 to $25,000. It appeared at the trial that the modifications referred to had been decided on at least as early as March 28, 1910. It was on that day that the city solicitor received Clay's letter containing the specifications to be attached to the contract.

These specifications, however, were not the original specifications on which bids had been tendered. They were modified specifications calling for less value than the original specifications, by about the sum of $20,000 to $25,000. These modified specifications must have taken some time to prepare and the jury were well warranted in believing that when the defendant Clay wrote his letter to the city solicitor on March 16, he had given directions to prepare the modified specifications, and that the period of twelve days elapsing between the writing of that letter and its delivery to the city solicitor was the time taken to prepare the modified specifications which went with the letter.

It further appears that on April 9, 1910, a permit was issued, upon application of John R. Wiggins & Company, to that corporation, by the bureau of building inspection, based on the revised plans covering the work specified in the second specifications and which was made a part of the second contract, although the advertisement

for bids under the second contract was not begun until April 16, 1910.

William G. Button, connected with the bureau above mentioned, testified that it usually took several days for the examination of plans, etc., before the permit was issued, but, whether it did or not, it took some time to compare the second specifications with the first and to prepare the revised plans. And it is a fair conclusion that these revised plans were also in existence before the mayor signed the first contract and which did not become operative until he did.

"Where a municipal contractor submits a bid to the city of Philadelphia and the bid is accepted, but the city subsequently refused to enter into a written contract in the matter, the contractor can maintain no suit against the city for breach of contract:" Smart v. Philadelphia, 205 Pa. 329.

The case would then stand thus: the defendant Clay knowing that the city had agreed to take work worth $20,000 to $25,000 less than that bid for by John R. Wiggins & Company, directed the contract with John R. Wiggins & Company to be prepared under the cheaper specifications, preserving, however, the price for the dearer, superseded specifications. Moreover, he permitted the contract to reach the mayor and to be executed by the latter as late as April 7, 1910.

The defendants seek to minimize the gravity of these facts by saying that the modified specifications were by error accidentally substituted by the director for the first specifications. The weakness of this position is that, even if it were true, it would not alter the fact that the director executed the contract at the figure of the dearer specifications, when he actually had in his hand the cheaper specifications which had superseded the dearer ones.

In weighing these circumstances, the jury had to consider these conceded facts:

1. There was a contract on the basis of the dearer

specifications, for $107,800; date, March 30, 1910; signed by the mayor April 7, 1910. This contract had attached to it, not the dearer specifications on which the bid was made, but the cheaper specifications which provided for work worth, not $107,800, but no more than $82,800 to $87,800.

2. On April 16, 1910, there was an advertisement for bids to be handed in on or before April 25, 1910. This was to be for a second contract on the work at Third and Race.

Under this contract there was virtually nothing to be done that was not provided for in the specifications actually attached to the first contract. The first contract had covered the whole matter, and the object of advertising was presumably to anticipate the objection that the first contract had been altered without re-advertisement. Had the parties been content with this technical method of legalizing an irregularity, the jury might well have inclined to leniency. The fact, however, stared them in the face that, under this so-called second contract, the city agreed to pay to John R. Wiggins & Company the sum of $13,890, in addition to the amount provided for by the first contract. This sum so to be paid was not only without any consideration whatever, but at the trial the defendants abandoned all idea of justifying it otherwise than by the principle that it is a tradesman's business to get what he can.

John R. Wiggins & Company had information in advance of other bidders, knew what the changes would be, knew that other bidders would be deterred from bidding, and, as before stated, his corporation would be getting what it bid, $13,890 (that being the bid on the second contract), practically for what cost it nothing, and, in addition, be enabled, by reason of the cheaper material and omissions of work as allowed in the second contract, to save from $20,000 to $25,000 on the work and material, as provided for in the first contract.

This so-called second contract was dated May 12, 1910. It had no specifications attached to it, but, inter alia, the contract stated that it was "in strict and exact accordance with the plans on file in the office of the city architect." The contract was on a printed form, "No. 49 Work Contract B Specification Clause," and there was erased in the same the following printed clause, "with proposal and specifications hereto attached which said proposal and specifications are hereby made a part of this agreement."

Not content with this, there was a third contract, of November 12, 1910. By it, certain work was to be done, not provided for by cheaper specifications attached to the first contract. Most of the work so to be done had, however, been provided for by the dearer or suppressed specifications on which the price paid was originally fixed. Yet the third contract promised to pay John R. Wiggins & Company an additional sum of $4,675.

In view of these facts, the commonwealth contended that on this Third and Race street contract, the city had been defrauded out of $35,000 to $40,000. The costly material had largely been cheapened. The tin roof, the marble trimmings, the granite and the copper, as provided for in the first contract, were changed in the second contract to slag roof, terra cotta trimmings, Wyoming bluestone and brick, and galvanized iron. The whole course of procedure plainly showed that the defendant Clay had determined that John R. Wiggins & Company was to have the profitable contracts in his department and so controlled matters that the end was accomplished in fraud of the city's rights.

We cannot say that the jury in taking this view wantonly disregarded the evidence or the weight of the evidence. On the contrary, we believe that they were well warranted in reaching the conclusion at which they finally arrived.

No thinking person ever would conclude that all this

could happen by accident or mistake, especially starting with the preparation of the specifications and the second contract before the first contract was prepared.

We next call attention to truck house No. 5 and fuel wagon house, Sixteenth and Catharine streets.

In the year 1909, the city of Philadelphia owned the land and buildings on the west side of Sixteenth street, above Catharine, used and occupied by the fire department as a truck house. The city desired to alter, renovate and add to it. Plans were prepared in 1909 by W. Bleddyn Powell, then city architect, for the renovation of the track house and addition to the same, and the erection in the rear of the lot of a fuel wagon house. These plans were dated August 6, 1909, and accompanying them were specifications drawn by the same architect.

February 25, 1910, Henry Clay, director as aforesaid, and one of the said defendants, advertised for bids in accordance with said plans and specifications, to be received by March 7, 1910. Four bids were received and on March 16, 1910, the contract was awarded to John R. Wiggins & Company. The contract was prepared and dated March 30, 1910, but was not signed by the mayor until April 7, 1910, and contemplated practically a new building, except the foundation and walls. Upon the printed proposal of John R. Wiggins & Company, there was inserted by hand, in ink, an additional proposal to substitute hot water heating for steam heating, at an additional cost of $500, but none of the other bidders included it, and there was evidence by one of them that he had not been requested to make an alternative bid for hot water heating.

Carl B. Zilenziger, city architect at the time, and one of the defendants, testified that after the advertisement and award to John R. Wiggins & Company on March 16, 1910, he received notice to come to Director Clay's office and there met him and Charles Seger; that Seger said to avoid a dangerous entrance into the street, the truck house front ought to be put back five feet in order that

there might be more room for the horses to come out upon Sixteenth street. To this Director Clay assented and directed him to make drawings for the alteration; that in accordance with these directions he visited the building and changed the plans, and at the same time made other changes in the building and other alterations in the plans and specifications.

Henry Clay, the director, testified that prior to the second advertisement, Charles Seger visited him and that the conversation was had about moving the front back and he called Carl B. Zilenziger down, and, after a consultation, directed him to make the change in accordance with the suggestion made by Mr. Seger and after the plans came down to him (Clay), he ordered the chief clerk to advertise, which he did on April 16, 1910. There is no definite time fixed when this conversation with Seger was had, but from the time ordinarily taken in the preparation of specifications and plans, it is as fair to assume that it was before April 7, 1910, as after that time, if we consider that after the consultation with Seger, the architect had to visit the truck house, prepare the new specifications, draw new plans and then the chief clerk prepared and sent out advertisements. If the conversation were before April 7, 1910, the day the mayor signed the first contract, why was not the first contract canceled and a new bidding had? If it were after April 7, 1910—but we are not convinced that it was—then why were there added to the change of moving the front back, all the other changes and omissions as found in the second specifications and revised plans, and which have not been explained except by Zilenziger's statement that they added to the efficiency of the building?

The specifications under the first contract provided for new foundation walls and new footings; the second dispensed with them. The first provided for excavations, under the rear part of the truck house to the depth of the present cellar walls, and concrete floor for the same;

the second dispensed with them. The first specifications provided for granite cut stone; second, for bluestone, granite and limestone. The first specifications provided for a large amount of marble work; and the second for terra cotta. The first specifications provided for structural steel; second, none. First specifications provided for tin roof; second specifications provided for repairing the slag roof over the front building and new roofs to be of slag. The first specifications provided for first floor joist and girders to be wholly removed and replaced; second specifications provided for joist to be replaced where unsound; and there were other provisions for cheaper material and omissions of material and work in the second contract and specifications, which, along with those shown above, reduced the cost of the alteration, renovation and addition of these buildings to the amount of several thousand dollars. Besides this, the advertisement of the work to be done under the second contract was for bids for alterations to truck house No. 5 in accordance with plans and specifications for work already under way, when the work was not commenced until June, 1910.

Also the second contract in this case was for "building additions to truck house No. 5, situate on the West side of Sixteenth street, North of Catharine St., in said city of Philadelphia, as required by the bureau of city property of the department of public safety, in strict and exact accordance with the plans on file in the office of the city architect." It was on printed form "No. 49 Work Contract B Specification clause." There were no specifications attached to it, and the following printed words were erased, "in strict and exact accordance with the proposal and specifications hereto attached which said proposal and specifications are hereby made a part of this agreement as fully to all intents and purposes as though herein set out at length." It may be concluded from the evidence that the specifications were in existence because a copy of the same was sent to

John M. Walton, city controller, December 3, 1910, and W. H. Walls, in his testimony, speaks of the specifications upon which he made his estimate, as well as the plans. Where did he get them?

The situation then was as follows: John R. Wiggins & Company had a complete contract for the alterations, etc., for $16,313 and another complete contract for the alterations, etc., for $11,985, and if the work were done under the first contract, it was impossible to do it under the second, and vice versa, and both contracts were awarded to them, because no other person nor firm would bid on the work to be done under the second contract. On this subject Willard H. Walls, one of the defendants, testified as follows:

"Q. When you got the second plans and the second specifications, what did you do in regard to putting in a bid?    A. Mr. Boston got those from the architect's office. I don't know whether he sent the office boy or not, but he had them and went over them himself first very carefully and he brought them into my office and he showed them to me and we looked over them together and we saw that while there might be some additional cost we did not just know how much and that beside then we wouldn't take any sub-bids, just simply look over the thing in general as we had the first contract at a very close profit and I didn't think from those plans anybody would come against us anyway and we decided to put in a jump proposal."

Admitting that the front walls should have been moved back five feet and that this work had to be advertised, it did not warrant the preparation of such plans as provided for a complete contract for a building in place of the one awarded under the first contract and for which latter building John R. Wiggins & Company was to receive $11,985, although the change of the front wall as aforesaid did not cost much, if any, over $1,000. It is true an experienced builder having the specifications and plans under the first contract and

the specifications and plans under the second contract, could tell what changes were to be made, but that did not alter· the fact that he must necessarily have seen that, if he did the work under the first contract, it would not be done under the second, and, if done under the second, it could not be done under the first.

The revised plans and the specifications upon which the second contract was based,. show deliberate and systematic change in work and material, cheapening the cost, but which provided, after everything was finished, for such alterations of an old building as made a practically complete new building outside of the walls and foundations. The work actually done upon the ground was done under these revised plans and specifications, or under the second contract, and when the building was complete the firm of John R. Wiggins & Company was, under the contract, entitled to receive $11,985, and that was all it ought to have received. Instead, however, of this being the case, John R. Wiggins & Company was paid as the work upon the building progressed, as though it were being done under the first contract, and, later on, they were paid, December 23, 1910, $11,385.75, and February 2, 1911, $599.25, the consideration mentioned in the second contract, receiving, altogether, the aggregate sum of $29,195, for what a number of witnesses testified was not worth more than the amount mentioned in the second contract. The evidence sustained the finding that the city was cheated and defrauded by paying twice for work and materials furnished once.

### BATH HOUSE MONTROSE AND DARIEN STREETS

The evidence of fraud in this case was not so glaring, but was done by manipulation of what was termed at the trial as a "Bulletin," which was a separate piece of paper claimed to have been prepared and rolled up with the plans and specifications, and the contents cf the "Bulletin" being included in the specifications at-

tached to the contract. The provisions of the "Bulletin" cheapened the work $4,000 or $5,000, and a number of witnesses testified that the plans and specifications given to them were different from the plans under which the work was done and the specifications which were attached to the contract.

John R. Wiggins & Company agreed to do the work under the specifications for $26,450, and, if the work as per "Bulletin" was omitted, $600 should be deducted. J. H. Jordan, the other bidder, bid $27,000 according to specifications, without reference to the "Bulletin."

It looked as though an unfair advantage had been taken, or that the "Bulletin" was an after-thought, especially when the value of the work and material deducted amounted to between $4,000 and $5,000. All the white enameled bricks for the pool and interior walls, as provided for in the specifications proper were omitted and cement and common sand bricks used, copper roof was replaced with tin, etc. On this point Willard H. Walls testified as follows:

"Q. In arriving at the amount to deduct as per the 'Bulletin,' did you go into the details and figure how much was put in and what was to go out by the 'Bulletin' in order to arrive at that $600? A. No, sir. Q. What did you do? A. We simply took that as what you might call a flyer, known in the building trade, took a chance of it going through. Q. And put that $600 down? A. Yes, sir. Q. And then upon the 'Bulletin,' as I understand, the award was made. A. Yes, sir."

It is plain that if any other builder had had the offer to bid as per "Bulletin," he would have deducted much more than $600 from his bid and therefore bid lower than John R. Wiggins & Company. The bidding was manipulated and we are of the opinion that the finding by the jury of conspiracy to defraud, by manipulation and unfairness to bidders, was proper under the evidence.

BATH HOUSE AT SEVENTH AND LOMBARD STREETS

The evidence to support the charge made in this case was that a bulletin, called "Proposal B," was rolled up with the plans and specifications, and that was what both bidders considered when they bid. These proposals have written on each of them, after the word "Proposal" written with the typewriter at the top of the page, the letter "B," in ink. Other prospective bidders testified that they never saw "Proposal B."

The omissions and deductions were similar in character and value to those contained in Bulletin claimed to be sent out with the plans and specifications of bath house at Montrose and Darien streets, and were evidently made as the result of fraudulent purpose and agreement. What we have called the "Proposals" of the bidders were what would commonly be called bids. They denominated them "Proposals," and if they actually had made their bids on the "Bulletin," why would they not have written the letter "B" with the typewriter the same as they wrote the word "Proposal"?

The reduction in cost, as made by the alleged "Bulletin," should also be considered. Any reputable bidder, with knowledge of the "Bulletin," would have made his bid approximately that much less.

It clearly appears from the evidence that the city of Philadelphia in the erection and construction of the police station, fire station and garage at Third and Race streets, and truck house No. 5 at Sixteenth and Catharine streets and the bath houses, was cheated and defrauded to the extent of many thousands of dollars. It was necessary, however, to establish by the evidence, beyond a reasonable doubt, that the fraud committed was actually intended. This appears from the previous statements as to how the contracts, specifications and plans were prepared and changed. They were not the simple concatenation of events, they did not prepare themselves, but were the work of master hands.

Changed specifications could not have been in existence before the first contract was signed unless somebody had made them; or, if they were proper, the first contract would have been withdrawn and the second advertised, awarded and executed in its place; and two contracts, as at Sixteenth and Catharine streets, each complete in itself, could not have been prepared without knowledge of what they meant. They were all parts of plans to cheat and defraud the city of Philadelphia by tricking it into paying large sums of money for what was practically nothing received, under the pretense of necessary changes.

Who were these persons who had these intentions? In other words, who were these conspirators? Who contemplated this fraud? Naturally we inquire who ordered the plans for the erection and construction of the buildings? Henry Clay. Who awarded the contracts? Henry Clay. Who directed them to be drawn? Henry Clay. Who received the benefit from them? John R. Wiggins and Willard H. Walls.

There is no direct evidence of a conspiracy, and, like a great majority of similar cases, the commonwealth was obliged to depend upon circumstantial evidence; and we can present the matter in no better way, if as well, than was stated by Judge ENDLICH in the case of Com. v. Beard, 48 Pa. Superior Ct. 319:

". . . . The issue presented is the broad one of the existence upon the circumstantial proof of a fraudulent conspiracy, not the narrow one whether any designated circumstance, supposed to be decisive in the minds of the jury, is established and in itself sufficient to make out the charge. It was said in Montgomery Web Co. v. Dienelt, 133 Pa. 585, at page 595:

"'There probably never was a case of circumstantial evidence that could not be blown to the winds by taking up each item separately, and dismissing it with the conclusion that it does not prove the case. The cumulative force of many separate matters, each perhaps

slight, as in the familiar bundle of twigs, constitutes the strength of circumstantial proof. . . .'

"And in Weil Bros. v. Cohn, 4 Pa. Superior Ct. 443, it is laid down that the existence of an alleged conspiracy is for the jury upon the aggregate, the cumulative effect of the whole evidence, although each isolated item of it, taken by itself, may fall short of establishing the charge. Of course that rule obtains here; and so treating this case, we have a state of facts either undisputed or indisputably inferable, whose collective interpretation in the light of ordinary reason and experience concerning the correlation between men's actions and motives may fairly lead to the conclusion the jury drew from them . . . .

"And so, as regards the contractors, it was for the jury to say whether they were conscious or unconscious of the fact that they were receiving payment for work they had never done. It was for the jury to consider whether they were or were not aware of it, when, as already mentioned, they were paid both for what they did and for what they were relieved from doing and whether their accounts for material and wages were or were not bound to apprise them of the excessiveness of Beard's allowances for excavations and concreting." And much to the same effect is:

"Where the officers of the state prepare a schedule for bids for furniture to be supplied to the State Capitol, and thereby invite bids to supply a number of articles of widely different nature of either woodwork, stone, marble, bronze, mosaic, glass and upholstery, at a specified price 'per foot,' without regard to the great difference in value of the material of which the several articles might possibly be made or the work required to manufacture the same, such acts on their part is evidence to the effect that they acted in collusion with the contractor, that they gave him inside information as to the construction which they would place upon the contract, that in consequence of the vagueness of the

terms of the schedule no other person could safely bid, and that in consequence thereof the state was cheated and defrauded. On an indictment for conspiracy against such officers and the contractor, all such matters are for the consideration of the jury:" Com. v. Sanderson, 40 Pa. Superior Ct. 416.

Henry Clay was director of the department of public safety and had under his control and supervision the preparation of plans and specifications, the advertisement for bids, the awarding of contracts and the supervision of erection and construction of buildings, similar to those involved in this case.

Section 1 of art. 14 of the Bullitt Bill of June 1, 1885, P. L. 37, Brown's Philadelphia Digest, 1195, par. 13, provides:

"Every contract for public improvements shall be based upon estimate of the whole cost furnished by the proper officer through the department having charge of the improvement, and no bid in excess of such estimate shall be accepted. Every such contract shall contain a clause that it is subject to the provisions of this act, and the liability of the city thereon shall be limited by the amounts which shall have been or may be, from time to time, appropriated for the same."

No estimate was requested of the proper officer as above provided. If there had been, the disparity between bids and real value would have been detected at once. Of course Clay stated upon the witness stand that he was an extremely busy man, occupied by his many duties and that it was impossible for him to carefully examine and investigate contracts, etc., which came under his supervision and control, and that was his excuse for these fraudulent contracts slipping through, as he alleged, in the way that they did. He stated that in the changes made at Third and Race streets and Sixteenth and Catharine streets, he took the responsibility for the same and they were actually made and occasioned by his order, although he paid no attention to the details.

We have no doubt he was responsible for the changes made, but are of the opinion they were planned before the first contracts were awarded. He claimed they were discovered to be necessary after the first contracts were executed, but in this he is contradicted flatly by the fact that the changes made and incorporated in the second contract at Third and Race streets had been planned and prepared on paper before the first contract was either prepared or executed. He was at Sixteenth and Catharine streets, saw the truck house and buildings which ought of themselves, from their condition, to have put him upon inquiry. Before any money was paid on the second contract relative to the truck house at Sixteenth and Catharine streets, there was a public hearing before the city controller, at which Henry Clay was present and what took place there was sufficient to have put him upon his guard and upon inquiry, and he ought to have asked for a delay until he had time to investigate, but instead of that he insisted upon the money being paid, and it was paid. In addition to this, Mr. Eisenhower, the chief of the bureau of city property, in October, 1910, informed Henry Clay that rumors were abroad that John R. Wiggins & Company were not honestly and faithfully performing their contracts with the city. This did not put Mr. Clay upon inquiry; and in January, 1911, Mr. Logan M. Bullitt called Clay's attention to an article in the "Evening Bulletin," wherein it was alleged that there was fraud and irregularity in the performance of the work by John R. Wiggins & Company at the bath house at Montrose and Darien streets. Mr. Clay did nothing. Investigation would have shown that the amount paid for the work done was much in excess of what it ought to have been.

John R. Wiggins was the president of the corporation of John R. Wiggins & Company. He had been largely instrumental in the organization of the company and building up the business, and he stated that obtaining the contracts was largely due to his personality. While

the amount of his interest in this corporation was not stated at the trial, it is fair to assume that it was considerable. He signed, as president thereof, at least seven of the contracts, the subject of the controversy in this case. His attorneys lay great stress upon the facts that the acts performed by him were of a perfunctory and formal nature, and that in the light of no direct evidence of any guilty knowledge upon his part, the mere fact that he executed these contracts was insufficient to sustain a verdict against him as conspirator. In other words, they contended that as president of the corporation of John R. Wiggins & Company he stood in a far different light than though he had been acting as an individual.

We are unable to see why a man should be excused from the natural conclusion of guilt arising from acts similar to those done by John R. Wiggins & Company, simply because he acted as president of the corporation and not as an individual. If as an individual he had executed these contracts, the inference would have been warranted that he knew all about them, notwithstanding he might have been engaged in a large business and had many clerks or subordinates under him. The explanation that he simply signed the contracts as a formal matter and knew nothing about them would not have been received unchallenged. Why should the president of a corporation be excused from the operation of a rule governing an individual, especially in the light of his own statement that the contracts obtained for the corporation were so obtained by force of his own personality, and in which contracts he no doubt was largely interested and would largely share in any profits that might be realized therefrom? It was incumbent upon him, as president of this corporation, actively interested in obtaining contracts for the same, to exercise the care and vigilance necessary to know what the contracts were, what his interest was in the same, and what they meant to him and the other persons connected with the corporation.

"In order to guard the public against losses and injuries arising from the fraud or mistake or rashness or indiscretion of their agents, the rule requires of all persons dealing with public officers, the duty of inquiring as to their power and authority to bind the government; and persons so dealing must necessarily be held to a recognition of the fact that government agents are bound to fairness and good faith as between themselves and their principal:" Com. v. Sanderson, 40 Pa. Superior Ct. 416.

Corporations organized for carrying on private business have the advantage conferred by law of limiting the liability of the parties for the debts of the business, and it is this incentive to enterprise which has induced states in modern times to grant such charters. In this broad public policy, however, there is no trace of an idea that such trading corporations may by their officers commit criminal acts and that all liability therefor may be eluded. As the corporation cannot be imprisoned for offenses to which such punishment is attached, it would follow, if the officers were not liable, that our general criminal statutes would be superseded by an ordinary charter to carry on one of the ordinary branches of business.

Is it probable that he made no inquiries why there were three contracts to one building and this condition happening twice? Is it probable that Walls, the treasurer and subordinate, examined the plans and specifications, estimated and bid upon them and knew of the excessive profits connected therewith and never said a word to John R. Wiggins about it? This seems to us highly improbable and we think the inference was well warranted that, from John R. Wiggins' interest in this corporation and his personal charge of the work, he did not blindly sign contract after contract without any inquiry or knowledge of what was contained therein, and his mere denial of this knowledge, supplemented by Walls' denial to the same effect, was insufficient to

excuse him in the light of what his personal connection was with the firm, and that it received excessive profits from these contracts.

Willard H. Walls by his own statements condemns himself. He knew of these excessive profits; he knew that the specifications, etc., were so drawn as to deter other bidders from bidding; and, knowing these things, as he stated, he took his chance, knowing at the time, as he stated, that, if Henry Clay was not ignorant of what was going on, he would not have awarded the contracts as he did. For the specifications contained in the "Bulletin" for the bath house at Montrose and Darien streets, he took a "flyer"—he took a chance of its going through when he bid $600 for deductions that were worth to his company from $4,000 to $5,000. For the buildings at Sixteenth and Catharine streets, on the second contract he and Boston looked over the thing in general and put in a "jump" proposal as he "didn't think from those plans anybody would come up against us anyway." And when he was asked.

"Q. When you put in what you call a jump bid and took a chance on it, did you have any idea or know whether Mr. Zilenziger or Mr. Clay knew that the cost of the omissions would exceed the cost of the additions?" he said:

"I know they didn't because if they had it wouldn't have gone through."

As to the Third and Race street buildings, in connection with the second plans and specifications, he stated "But having in mind that the keen competition that I went through in the first contract there against all the builders of the city and taking the job as a whole, I put in a bid which might be termed a jump bid so as to even up the entire proposition."

"Q. I ask you this, did Mr. Zilenziger or Mr. Clay known that that difference between the turning around of the building and the work done and the omissions would be a saving to you? A. Not to my knowledge at

all. As I said before, I am pretty sure if they had it wouldn't have gone through."

It is unnecessary to quote anything further with regard to this matter. Here was contract after contract in which Walls took what he called "flyers" and "jump" bids, admitting himself that he did it, trusting to the ignorance of the architect and the director to let it slip through because they didn't know what it meant. He had no right to take advantage of what he claimed to be the ignorance of the architect and the director, but we are not inclined to believe this statement to be the truth. The acts, which Clay did, warranted the jury in the conclusion, beyond a reasonable doubt, that he took part in these transactions which resulted in the cheating and defrauding of the city and he knew it at the time.

John R. Wiggins & Company received contract after contract from the city awarded by Henry Clay—forty-two out of fifty-seven. Walls, according to his own statement, made estimates upon buildings, etc., and bid time and again, and yet he claims that he very rarely saw Henry Clay and Henry Clay said that he practically only had a speaking acquaintance with John R. Wiggins.

We are satisfied, without going further into detail or stating any more facts, that these three men, Clay, Wiggins and Walls, were parties to these transactions. They intended and contemplated cheating and defrauding the city of Philadelphia, they did it, and the verdict of the jury was warranted beyond a reasonable doubt.

It has been urged that the acquittal of Carl B. Zilenziger under the facts and the charge of the court, was inconsistent with the conviction of the three other defendants. We must take the finding of the jury as conclusive upon this question. It is not for us to criticise it. There was evidence to the effect that Carl B. Zilenziger was a subordinate and acted entirely under the instructions and control of Clay, the director of the department of public safety, and, while he stated that

he issued certificates during the progress of the work and upon which vouchers were issued, he did not do it upon what he believed to be the actual value of work done and materials furnished, but only on what he calculated was the proportion of work done; that he had nothing whatever to do with the awarding of the contracts nor the preparation of the same, and from this we are inclined to the opinion that the jury reached the conclusion it did upon the assumption that he was simply acting as a subordinate under directions and had no actual part in the conspiracy; that if he did have, he acted unwittingly. He had no power to award contracts. It was his duty to prepare plans and specifications under the direction of the director. Their mere preparation was therefore not even ground for suspicion of guilt. The real guilt lay in the use which was made of them.

Under the evidence, the jury were entitled to believe that the illegal use of them was made not by him but by his superiors. It was the jury's function to pass on this fact and to ascertain guilty intent beyond reasonable doubt. We cannot say that the jury were unwarranted in refusing to believe Zilenziger guilty.

The defendants filed ninety-four reasons for a new trial. Very few of them need any special attention or remarks. They are largely composed of excerpts from the court's charge, which it would be unfair to consider separately from the context, and it would also be unfair to consider the charge on the question of inadequacy separate from the thirty-three points submitted by the defendants for the court to charge upon, and which we answered, with the exception of eight or nine, in favor of the defendants. We do, however, call attention to a few of the reasons, viz:

"62nd. The learned court erred in permitting the commonwealth to treat, as if under cross-examination, the witness Walter S. Hopper, called by the commonwealth."

450     COMMONWEALTH *v.* CLAY, Appellant.

Opinion of Court below—Opinion of the Court.     [56 Pa. Superior Ct.

"64th. The learned court erred in permitting the commonwealth to treat the witness William G. Wolfersberger as if under cross-examination."

We did permit the district attorney practically to cross-examine both of these witnesses. Walter S. Hopper was chief clerk of Director Clay, one of the defendants, and William G. Wolfersberger was assistant to the city architect, Carl B. Zilenziger, another of the defendants. They both were exceedingly unwilling witnesses for the commonwealth and very willing ones for the defendant. In the exercise of, what we considered, our proper discretion, we permitted this cross-examination and are of the opinion that it was no error.

And now,          1913, in accordance with the aforegoing opinion, rule for new trial is discharged.

*Errors assigned* were (48, 49, 50) refusal to instruct the jury that the three defendants respectively must be acquitted; (21–28, 29, 30) portions of charge quoted and referred to in the opinion of the Superior Court; (54) permitting the commonwealth to introduce evidence as to the awarding of forty-two other contracts to John R. Wiggins & Company; (64–68) rulings in relation to proceedings upon motion for a new trial based upon misconduct of jurymen.

*Wm. A. Glasgow, Jr., George S. Graham* and *Chester N. Farr, Jr.,* with them *Charles S. Wesley* and *Joseph Gilfillan,* for appellants.

*Joseph H. Taulane,* assistant district attorney, with him *Samuel P. Rotan,* district attorney, for appellee.

OPINION BY PORTER, J., March 12, 1914:

The indictment charged Henry Clay, John R. Wiggins, Willard H. Walls and Carl Zilenziger with conspiracy to cheat and defraud the city of Philadelphia, and with having, in pursuance of such conspiracy, been

guilty of overt acts, in the letting and carrying out of contracts for the erection and alteration of certain buildings, by which the said city was defrauded of a large amount of money. Henry Clay was, at the time of the letting of said contracts, of the performance of the work thereunder and of the payment for the same, the director of public safety of the city of Philadelphia; Carl Zilenziger was the city architect, whose duty it was to prepare plans, drawings and specifications for and to supervise the erection and construction of buildings for the city; John R. Wiggins was the president and Willard H. Walls the treasurer of a corporation called John R. Wiggins & Company, engaged in the business of general contractors and builders, and to which the contracts for the construction and alteration of the buildings in question had been awarded. The trial in the court below resulted in the acquittal of Zilenziger and the conviction of Henry Clay, John R. Wiggins and Willard H. Walls. The defendants so convicted have severally appealed.

Having carefully examined the voluminous evidence we are convinced that the facts which it discloses are fairly stated by Judge STAPLES, in his opinion discharging the rule for a new trial, which will appear in the report of this case, and it is unnecessary that we re-state the facts at length. The most flagrant instance of imposition upon the city disclosed by the evidence arose out of the manner in which the contracts for the erection of the police station, fire station and garage at Third and Race streets were manipulated. The original plans and specifications for that work had been prepared by Mr. Powell, the former city architect, whose health had failed and he had nothing to do with the awarding of these contracts. Those plans and specifications contemplated the erection of the fire station fronting on Race street. The city officers advertised for bids for the erection of the buildings according to those plans and specifications, and in response received three bids,

that of Wiggins and Company being the lowest, and Mr. Clay, as director of the department of public safety, on March 16, 1910, awarded the contract to that company. Mr. Clay wrote a letter to the city solicitor, dated March 16, 1910, but not received by the latter officer until March 22, stating that he had so awarded the contract and requesting the latter officer to draw a contract in triplicate, the letter being accompanied by three copies of the specifications to be attached to the copies of the contract. The specifications thus sent to the city solicitor were not the same upon which the bids had been received, and they contained such modifications as to reduce the value of the work which Wiggins & Company would be required to do to the amount of from $20,000 to $25,000. The contract with the specifications so changed was prepared by the city solicitor, in accordance with the request of Mr. Clay, and was subsequently signed by Mr. Wiggins. This substitution of the cheaper specifications was attempted to be explained at the trial by the defendants upon the theory that it was a mistake, and that those specifications had really been prepared in anticipation of the letting of a second contract providing for the erection of the buildings under the new specifications. Even if this explanation was well founded, it disclosed that, at the time Mr. Clay instructed the city solicitor to prepare the first contract, and before the city had become bound by that written contract, these parties knew that the buildings were not to be erected in accordance with the expensive specifications which ought to have been attached to the first contract.

Within a very few days after this contract had been signed by the mayor of the city and Wiggins & Company, Mr. Clay announced his intention of changing the plans for the erection of the buildings, so as to shift the garage to the Race street front and locate the fire station at the other end of the lot, fronting on Florist street. The location of the police station, which was the

principal building, remained unchanged.   On April 16, 1910, Mr. Clay, as director of public safety, caused to be published advertisements for sealed proposals "for certain additions to work already under way in the matter of the construction of police and fire stations and garage, No. 319–25 Race street, . . . . plans and specifications for all the above to be had at the office of the city architect."   The plans and specifications referred to provided for the erection of the garage on the Race street front of the lot and the fire station at the other end of the lot, fronting on Florist street.   These plans and specifications, however, went far beyond any mere provision for the change in the location of the fire station and garage; they cheapened in many ways the specifications for the construction not only of the fire station and the garage but of the police station, the location of which was not changed.

The first contract provided for the erection of the buildings under expensive specifications and it was awarded to Wiggins & Company upon their bid at the sum of $107,800.   The second contract, which ostensibly provided for additions to the work already commenced cheapened the specifications for the entire group of buildings, and this contract was awarded to Wiggins & Company, that corporation being the only bidder, at the sum of $13,890.   The first contract, if the proper specifications had been attached, provided for everything in connection with the construction of the three buildings. The second contract also provided for everything in connection with the construction of the three buildings, but substituted other and cheaper materials for those which under the first contract Wiggins & Company would have been required to furnish, and omitted entirely some of the work required by the first contract. Owing to the manner in which the second contract was let, being for additions and alterations to a building for the erection of which Wiggins & Company then had a contract, that corporation had a manifest advantage over

any other contractor who might have contemplated bidding upon the second contract, and the result was that there was no other bid. Before these buildings were completed, on November 12, 1910, a third contract was awarded by Mr. Clay to Wiggins & Company for certain work to be done in the construction of these buildings, which was not provided for by the cheaper specifications of the second contract. Most of this work had, however, been provided for by the original specifications which ought to have been attached to the first contract. Yet by this third contract the city was required to pay to John R. Wiggins & Company an additional sum of $4,675. The corporation of Wiggins & Company was actually paid the entire consideration called for by each one of these three contracts.

The contracts for the alteration of and additions to truck house No. 5, at Sixteenth and Catherine streets were manipulated in the same manner. After the first contract had been awarded to Wiggins & Company it was determined to move back the front wall of the building a distance of five feet, and within a few days after the first contract had been awarded, Mr. Clay advertised for proposals for certain additional alterations at Sixteenth and Catherine streets "to work already underway." The specifications for this second contract provided not merely for the moving back of the front wall, but in themselves provided for all the alterations which were to be made in the building, and cheapened the work required to be done, some work provided for under the first contract being entirely omitted. The situation thus created made it impossible for any contractor other than Wiggins & Company to bid upon the second contract and it was awarded to that corporation upon its bid. In this instance also a third contract was awarded to Wiggins & Company, on November 1, 1910, for work the greater part of which had been provided for by the specifications of the first contract, but had been omitted from the cheaper specifications of the sec-

ond contract. The corporation of Wiggins & Company was paid for work supposed to have been done on this building the entire consideration mentioned in each one of the three contracts. The evidence warranted a finding that the contracts for the erection of two bath houses were awarded to Wiggins & Company upon specifications which were not the same as those furnished to other prospective bidders. The facts as to all of these contracts are fully and fairly stated in the opinion of Judge STAPLES.

The testimony clearly established that the amounts paid to Wiggins & Company, and received by Mr. Wiggins and Mr. Walls as officers of that corporation, upon each of these several contracts were grossly excessive. The evidence warranted a finding that when the first contracts for the buildings at Third and Race streets and at Sixteenth and Catherine streets were awarded, that it was not the intention of these defendants that those buildings should be erected and constructed according to the plans and specifications upon which the bidding had taken place, that it was then the intention of the parties that supplemental contracts should be let and new specifications provided, which would be very advantageous to Wiggins & Company who secured the first contract and greatly cheapen the cost of construction; that it was the intention of the parties that Wiggins & Company, through this manipulation of the contracts, should collect from the city of Philadelphia a grossly excessive price, and that the city was defrauded in pursuance of a corrupt combination to which all the defendants were parties. It is, of course, possible that the city officers may have been merely negligent and incompetent, but in view of the number of the blunders involved the court could not declare as matter of law that those officers had been merely negligent or incompetent. The learned judge was, therefore, clearly right in refusing the prayer of each of the defendants that the jury be instructed that they, respectively, must be ac-

quitted. The question of the guilt or innocence of the defendants was for the jury.

The burden was upon the commonwealth in this case to satisfy the jury beyond a reasonable doubt that there had been a conspiracy, a confederation for the purpose of defrauding the city, between two or more of the defendants or some one of them and a person or persons not named. It was not necessary to prove by direct evidence when and where the corrupt agreement had been made, nor the terms thereof, nor by whom it was originated. The case may be made out by proof of such circumstances and such acts of the several parties as to logically lead the jury to the conclusion that the conduct of the defendants could be rationally explained only on the theory of the existence, however formed, in the minds of the parties of a common, unlawful design, entertained and understood by all of them, in pursuance of a corrupt confederation to defraud; in short, a conspiracy as charged in the indictment: Com. v. Sanderson, 40 Pa. Superior Ct. 416, 473; Com. v. Snyder, 40 Pa. Superior Ct. 485, 523. When the evidence is of this character the inference of conspiracy is permissible, but that inference is to be drawn by the jury, when satisfied of its correctness beyond a reasonable doubt: Com. v. Beard, 48 Pa. Superior Ct. 319, 340. There is no such thing as an inadvertent and negligent conspiracy; there must be intended unity of purpose: Com. v. Tilly, 33 Pa. Superior Ct. 35. The charge of the court to the jury in the present case was in most particulars correct and many of the assignments of error are without merit. When, however, the learned judge proceeded to instruct the jury as to the legal principles applicable, under the evidence, to the case of each of the individual defendants, respectively, he failed to discriminate between the functions of the court and those of the jury, and thus fell into error.

The learned judge charged the jury, in that part of the charge embraced by the twenty-first specification of

error, referring to the defendant, Henry Clay, as follows: "The Commonwealth contends that because he was so intimately connected with these transactions, and because Eisenhawer called his attention that the architect was not sending to him the plans, as he ought to have sent them, and that he was at the hearing held before the City Controller, therefore, he ought to have been put upon notice, and if he were put upon notice, he would have made the inquiry, and if he made the inquiry he would have found that the city was cheated and defrauded, and if he permitted any payments to be made after that time, then he would be guilty of being one of the parties to this conspiracy to cheat and defraud. If there is enough evidence in the case to convince you beyond a reasonable doubt that Henry Clay did have notice, that he did make inquiry, and upon that inquiry he found that moneys were still to be paid, and he knew then, after making inquiry, that the city of Philadelphia was being cheated and defrauded, and he permitted the money to be paid, we say to you that he would be guilty as one of the parties to this conspiracy, if you find a conspiracy, because as we have said you must find more than one person engaged in the conspiracy, but in order to convict Henry Clay of this offense you must find, beyond a reasonable doubt, that he had a guilty knowledge of this transaction." Under this instruction the jury must have understood that it was their duty to find a verdict of guilty as to Clay if they were satisfied of the following facts, without more; viz., that Clay had discovered, before the last money was paid upon any one of the contracts, that he had been deceived by his subordinate, the city architect; that the city was being cheated and defrauded, and that after the discovery he, Clay, took no steps to prevent the payment of the last money upon the contract. Now, if the jury had returned a special verdict finding all these specific facts, that verdict would not have been responsive to the issue in this case. The gravamen of the offense charged

was the conspiracy, the corrupt combination of two or more persons to do an unlawful act. The facts so stated were sufficient to warrant an inference by the jury that Clay was a party to the conspiracy, but the court was not warranted in declaring, as matter of law, that those facts standing alone constituted Clay guilty of the crime charged in the indictment. Let it be conceded that the facts were as stated and, further, that Clay had discovered that the city was being defrauded through a conspiracy between Walls and Wiggins or between Walls and Zilenziger, it was still for the jury to determine whether the failure of Clay to prevent the payment of the last money on the contract established beyond a reasonable doubt that he was a party to the conspiracy, or was the result of negligence, incompetency, or reluctance to admit that he had been inefficient in the discharge of his duty. The twenty-first specification of error is sustained.

The court fell into the same error in those parts of the charge which dealt with the cases of Walls and Wiggins, respectively. The learned judge said referring to the defendant Walls, in that part of the charge which is the subject of the twenty-eighth specification of error: "Did he know? You remember his testimony, gentlemen of the jury. He said seeing the second contract and thinking no one else would bid upon it, they gave a flyer, they did not make an estimate of what it was actually or reasonably worth to do this work; they gave a flyer; they took it on the jump. Did he know? Do you believe he knew? If he took any money from the city of Philadelphia, knowing that his firm had taken an unfair advantage, we say to you, gentlemen of the jury, that he was guilty of conspiracy to cheat and defraud, if you find that any other person had entered into this arrangement with him." This instruction left entirely out of view, so far as Walls was concerned, any question of the good faith of the city officers in the awarding of the first and second contracts. The jury

must have understood this instruction as meaning that
if Walls knew that the manner in which the city officers
invited bids and awarded the first and second contracts
rendered it improbable that any person other than Wig-
gins & Company would submit any bid upon the second
contract and thus gave to that corporation an advantage
over other bidders, even though the action of the city
officers had been taken in good faith, but mistakenly,
and not in pursuance of any conspiracy; if Walls and
Wiggins, with this knowledge, took advantage of the
situation created by the incompetency of the city officers
and submitted a bid which was excessive and received
any money from the city of Philadelphia upon the re-
sulting contract, then they were guilty of conspiracy to
cheat and defraud, as charged in the indictment.    We
are not here dealing with the question of the enforceabil-
ity of these contracts, nor are we to inquire whether
the contracts might have by proper proceedings been
set aside because of the negligence of the city officers.
The question is whether, upon the facts stated, it was
for the court to declare, as matter of law, that the de-
fendants were guilty of a criminal conspiracy.    If the
officers of a city, or individuals acting for themselves
enter into a contract with two or more contractors for
the erection of a building according to certain plans and
specifications, and before the building is completed, or
even commenced, determine upon changes in or addi-
tions to the building, and invite bids for the making of
such changes or additions, it is altogether probable that
the contractors who have secured the first contract
will have a decided advantage over any other bidder
upon the second contract.    Now, in such a case, can it
be held to be a criminal conspiracy if the contractors—
who have secured the first contract—agree, among them-
selves, that they will take advantage of the situation
and demand and receive an excessive price for the work
required by the second contract, in the absence of any
evidence that they had been guilty of any misrepresenta-

tion or deception? The contract referred to in the language above quoted was that for the alteration of truck house No. 5, at Sixteenth and Catherine streets, and substantially the same instructions were given in that part of the charge embraced by the twenty-ninth and thirtieth specifications of error, with regard to the contract for the construction of the police station, fire house and garage at Third and Race streets. The facts stated by the court in these parts of the charge, if found by the jury, were evidence from which, taken in connection with the other testimony in the case, it was proper for the jury to infer that all the defendants were guilty of a criminal conspiracy, but that inference was one which the jury alone was authorized to draw. The charge of the court bearing upon the case of the defendant John R. Wiggins, upon which the thirty-first specification is based, is properly subject to the same criticism. The jury might properly, under this instruction, have believed it to be their duty to convict Wiggins in case they found that he and Walls knew that the corporation which they represented was receiving excessive profits under these contracts, or that the changed plans and specifications prevented fair and open bidding, and that with this knowledge they had bid an excessive price upon the two contracts. The twenty-eighth, twenty-ninth, thirtieth and thirty-first specifications of error are sustained.

The court permitted the commonwealth to prove that during a period of about four years prior to the finding of the indictment the defendant Clay, as director of the department of public safety, had awarded to the corporation of John R. Wiggins & Company forty-two contracts for the construction of buildings, while only fifteen of such contracts had during the same period been awarded to other parties. The fifty-fourth specification of error is founded upon an exception taken to the admission of this evidence. The witness who testified to these facts had been called by the commonwealth and cross-examined by the defendants, and upon such cross-

examination had said that he, being an employee of the department of public safety, had never noticed anything wrong in the dealings between Mr. Clay and John R. Wiggins & Company. The commonwealth on the re-direct examination of the witness introduced the evidence to which exception was taken. The court in admitting the evidence said: "The fact standing by itself would not indicate that there was any dishonesty or corruption, but it might be one fact to be connected by their instruction, which might make it material in this case; and the witness having been interrogated and cross-examined by counsel for defendants as to whether or not he did not know of anything that would indicate fraud." It was no doubt argued in the court below as it has been here that the fact that forty-two out of fifty-seven construction contracts, during a period of four years, were awarded to John R. Wiggins & Company, indicated that the corporation of John R. Wiggins & Company was a favored contractor. It was not shown, nor was there any offer by the commonwealth to show that there had been any fraud, irregularity, or circumstance tending to excite suspicion in connection with the letting and execution of any one of these forty-two contracts. The language of the court in admitting the testimony must have been understood by the jury to mean that, while the number of contracts standing alone would not of itself indicate fraud, the fact that such a number of contracts had been awarded was proper to be considered in passing upon the question whether there had been a fraudulent connection between these parties. If the commonwealth had offered to show that in these forty-two contracts, or in some of them, the same course had been pursued which operated to the detriment of the city in the manipulation of the contracts recited in the indictment, the testimony would have been admissible, as tending to establish a system and to show that the acts charged in the indictment were part of a consistent series of frauds, intentionally

committed, and not attributable to mere negligence or mistake: Com. v. Sanderson, 40 Pa. Superior Ct. 416. "Where in conspiracy an overt act is done within two years, and said act is but one of a series of acts committed by the parties, evidently in pursuance of a common design and to carry out a common purpose, such acts would be evidence, provided they tend to show that the last act was part of a series and the result of an unlawful combination; and such evidence may satisfy a jury of the existence of a conspiracy at the latter period:" Com. v. Bartilson, 85 Pa. 482. The evidence as to the forty-two contracts, some of which had been awarded four years prior to the finding of the indictment, did not tend to show that there had been any fraud in the award or execution of those contracts; it did not "tend to show that the last acts (those charged in the indictment) were a part of a series and the result of an unlawful combination." There was nothing in the evidence from which a jury should have been permitted to infer that those contracts were not let to the lowest bidder in each case, or that the work was not honestly performed. This specification of error is sustained.

The sixty-third specification of error is not sustained by an exception taken in the court below and must be dismissed. The remaining specifications of error refer to the action of the court in the proceedings upon the motion of the defendants for a new trial. One of the reasons assigned for a new trial was the reading, during the trial, by the jurors of newspapers which contained accounts of and comments upon the proceedings prejudicial to the defense. In support of this reason the defendant Henry Clay filed an affidavit and petition to which were attached copies of the newspaper articles complained of and which the affidavit alleged had been read by the jurors. Some of these articles contained attacks upon certain individual members of the jury and alleged that those particular jurors were friends of the defendant Clay, and if the defendants, when they

acquired knowledge of the publication of the articles had moved the court for the withdrawal of a juror and the continuance of the cause, if it appeared that the articles had been read by the jury, there might have been good ground for granting the motion. The affidavit of Mr. Clay states that the defendants had knowledge of the publications complained of and called them to the attention of the court during the progress of the trial, and clearly indicates that the defendants not only knew of the publication of the articles but that they were being read by the jury; it states "that the jury read these newspapers—in fact on some of the days bringing the newspapers into the jury box with them." The defendants, with this knowledge, elected to let the trial proceed and made no motion to discharge the jury. "If the defendant supposed that he could not have a fair trial, he ought to have laid the matter immediately before the court, and requested that the jury might be discharged. He ought not to have taken the chances of a verdict in his favor and kept his motion for a new trial in reserve:" McCorkle v. Binns, 5 Binney, 340; Eakman v. Sheaffer, 48 Pa. 176; Com. v. Razmus, 210 Pa. 609; Nemcof v. United States, 202 Fed. Repr. 911; Com. v. Beard, 48 Pa. Superior Ct. 319. The defendants having, with knowledge, elected to take their chances with the jury, we would not now be warranted in holding the court below guilty of an abuse of discretion in refusing, upon that ground, to grant a new trial, and the sixty-eighth specification of error is overruled.

The defendants urged as another reason for a new trial that certain of the jurors had been guilty of misconduct during the course of the trial. The affidavit of Mr. Clay stated that the commonwealth had employed detectives to shadow the individual jurors and that the reports of such detectives, in possession of the district attorney, showed that one juror not only talked to the detectives during the course of the trial, but on the fifth day of the trial, two weeks before the closing of the

testimony, he had declared to one of the detectives that he and the other members of the jury had decided that the defendants were guilty. The defendants presented petitions praying that the jurors be examined and required to testify as to their proceedings. The court declined to so order, which action is the foundation of the sixty-fifth and sixty-sixth specifications of error. It is well settled that jurors, after they have rendered a verdict, ought not to be admitted to give testimony to invalidate that verdict: Cluggage v. Swan, 4 Binney, 150; Holt v. United States, 218 U. S. 245; and these specifications of error must be overruled.

The defendants having entered a rule to take depositions in support of their motion and reasons for a new trial, the district attorney moved to vacate that rule. The court upon hearing this motion made the following order: "Under the rule heretofore taken by the defendants, they are hereby permitted to take the depositions of witnesses in support of a motion for a new trial, but no juror may be examined as one of such witnesses. To this extent the rule heretofore entered by the defendants is modified." The defendants, under the rule as modified, called as witnesses, before a notary public agreed upon between counsel for the commonwealth and the defendants, Robert D. Cameron, captain of detectives, and James Tate, Junior, lieutenant of detectives. These witnesses, respectively, after having stated their official position, were among other questions asked: "What were the names of the detectives or special officers that were assigned by your department, to watch the jurors?" Each of the witnesses, after having been told by the district attorney that he could not be required to answer any question, declined to answer this question, or to give any information whatever as to the names of the detectives who had shadowed the members of the jury during the trial. The defendant Walls thereupon presented to the court his petition, praying the court to order and direct said witnesses to answer the questions

which they had declined to answer. The court granted a rule on Cameron and Tate to show cause why they should not be directed to answer the questions in the record of the testimony, attached to the petition of Walls. Upon the hearing of this rule, the court directed the district attorney to allow counsel for the defendants to examine and make copies of all reports which had been submitted to him by the detectives, and this was done. When these reports were produced they disclosed that one of the detectives had made a report on the fifth day of the trial, more than two weeks before the testimony was closed, which stated that juror No. 7, who then believed that he had been discharged from further service as a juror, had said to the detective, "It was a good thing for Clay he was out of the jury because he said that he, as well as the rest of the jurors had their own opinion of the case, and he said that Clay was a sure convicted man as far as he was concerned." Reports made by two detectives, at different dates stated that juror No. 12 was talking about the Clay case every night, at a cigar store on Race street. The report of another detective might fairly give rise to an inference that he had at least attempted to talk to one of the jurors about the case. It must be borne in mind that these reports were not competent, primary evidence as to what the jurors had done or said; they were simply what the detectives had reported to the district attorney that the jurors had said. These reports did not disclose the names of the detectives who made them; the identity of the detective making the report being concealed by designating him in the report, as "P-1," "D-1," "S-1," "S-2," "C-21," "40," "45," "Operative Seg.," "Operative No. 8," and so throughout the list. If these reports of the officers acting for the commonwealth were true one of the jurors was talking about this case every night during the trial at a cigar store and another of them had declared that he possessed a fixed opinion as to the guilt of the defendant Clay before the case had

466    COMMONWEALTH *v.* CLAY, Appellant.

Opinion of the Court—Dissenting Opinion.    [56 Pa. Superior Ct.

been half tried. The court had this information before it. There was nothing which invested the detectives employed in shadowing this jury with any peculiar privilege, nor is there any principle of public policy which would excuse them from testifying. We are of opinion that, in these circumstances, the defendants were entitled to know who these detectives were, in order that they might personally call them to testify as to what the jurors had said and done. The sixty-fourth specification of error is sustained. The effect, if this were the only specification of error sustained, would not be to strike down the verdict, but would only result in remitting the record to the court below, for the purpose of permitting the testimony to be taken, and properly disposing of the motion for a new trial; but as we have sustained other specifications of error which render a retrial of the case necessary, the disposition of this particular specification is without practical results. We find nothing requiring further discussion in the specifications of error not hereinbefore specifically dealt with.

The judgments against the several defendants Henry Clay, John R. Wiggins and Willard H. Walls are reversed, and a new venire is ordered.

HEAD, J., dissenting:

With all due respect for the action of the majority of this court, I am unable to assent to the soundness of the conclusion reached. I therefore deem it my duty to at least indicate the reasons that impel me to dissent. The judgment of the learned court below is reversed and a new trial ordered because of (a) certain portions of the charge of the trial judge declared to be harmful misstatements of the law; (b) the admission, against the objections of the defendants, of an item of evidence, which, it is held, should have been rejected.

I am in entire harmony with the conclusion, so clearly demonstrated by the majority opinion, that there was evidence to warrant findings by the jury that the city

was grossly defrauded and that this result followed from the manipulation, as it is called, of the contracts in question. I take it the evidence furnishes an equally clear warrant for the conclusion that this manipulation could not have happened without action by each and every one of the defendants; action it is true innocent if the result merely of negligence no matter how marked; guilty if designed and intended to secure the result actually attained. It was earnestly contended for each of the defendants, that such participation by him in the manipulation of these contracts as was shown by the evidence, was the result merely of mistake, oversight, reliance on the integrity of subordinates, or at the worst of carelessness and neglect of duty. In this respect the issue between the commonwealth and the defendants was sharply drawn.

The opening portions of the charge were devoted to an explanation of the offense of conspiracy generally. Carefully, accurately and in language not easily misunderstood, the learned judge laid before the jury the nature and essential ingredients of the crime as well as the quality and character of the evidence which must be produced to warrant a finding that the defendants or some of them had entered into a conspiracy. They were pointedly told that no man, acting alone, could be guilty of that offense no matter how criminal in other respects his acts might be. They were instructed that no amount of blundering, incompetence or neglect of duty merely, would support a verdict of guilty. In a word, in these and like aspects of the case the general instructions to the jury furnish no ground for just criticism.

The trial judge then proceeded to take up the case of each defendant separately. He drew the attention of the jury to the evidence tending to prove the acts done by that particular person and the manner in which they should be considered by the jury in the light of the respective contentions of the Commonwealth and

the defendants already referred to. It was in the portions of the charge so dealing with the case of each defendant, the trial judge used the language complained of in the several assignments, [constituting group (a)], which have been sustained. A single illustration will, as I think, indicate the reason I am not able to accept, as sound in law, the conclusion of the majority of my brethren, on this branch of the case.

In dealing with the case of the defendant, Clay, the trial judge, after placing before the jury the various considerations urged by the defense, to convince them the acts of the defendant were innocent; and then stating the contention of the commonwealth, used the language quoted in the majority opinion sustaining the twenty-first specification of error.

From the use of the language quoted the opinion predicates this conclusion, viz.: "Under this instruction the jury must have understood that it was their duty to find a verdict of guilty, as to Clay, if they were satisfied of the following facts, without more, viz.: that Clay had discovered, before the last money was paid upon any one of the contracts, that he had been deceived by his subordinate, the city architect; that the city was being cheated and defrauded, and that, after the discovery he, Clay, took no steps to prevent the payment of the last money upon the contract." Why "must the jury have understood" that this was their duty? Is the conclusion as sound as its expression is forcible? Even if the utterance complained of be read in the light only of what had been just previously said respecting the defense advanced by that defendant, ignoring all that had been so clearly explained in the earlier portions of the charge, its just interpretation seems to me to be widely different from that accorded to it. It was but another way of saying that if the jury attached to the evidence referred to the significance ascribed to it by the commonwealth, the defense set up for this defendant, adverted to already and by the trial judge,

had failed. Or that if no other barrier stood in the way of the commonwealth, except the defense that the acts of the defendant Clay, were the result of mistake, ignorance, or negligence, and that line of defense was shattered, he might be properly convicted. But when the statement of the trial judge is reviewed, not only with its immediate context, but in the light of what he had theretofore so clearly explained, I can find no solid ground for the judgment that the jury were misled to the conclusion that the defendant Clay, if they believed him innocent down to that time, should be convicted of conspiracy merely because he had discovered that some contractor was about to take unearned money from the city treasury and took no steps to prevent it.

Still further, the record shows that the trial judge affirmed a series of prayers for special instructions presented by counsel for defendants. They covered almost every material phase of the case. They again and finally directed the attention of the jury to the same considerations laid before them in the earlier portions of the charge. Adopting the language of defendant's counsel the judge again told the jury that no defendant could be convicted unless they could find he had entered into a combination or agreement with others to cheat and defraud the city. That the receipt by some of the defendants of "excessive, even unwarranted profits," would not support a verdict of guilty, unless there was a previous combination to bring about that result. In the light of these instructions, general and special, I am wholly unable to agree that the trial judge misled the jury to the conclusion stated in the majority opinion. I would dismiss all of the assignments of error complaining of the charge to the jury.

I would also dismiss the fifty-fourth specification of error sustained by the majority opinion. John R. Wiggens, defended largely on the ground that he signed the contracts simply as the executive officer of his firm

without any knowledge of any manipulation of them, in ignorance that they were so duplicated as to bring to his firm large sums of the city's money for which no service was rendered. Of course if the jury accepted that statement he had not combined or confederated with anybody and was innocent of the offense charged.

But the commonwealth, as I view it, clearly had the right to offer evidence that would tend to weaken or break down that line of defense. It was permitted to prove, that the defendant had been awarded most of the city contracts within the past two years. Why was that fact irrelevant? It at once showed this particular defendant was no novice in city contracts and was not likely to be ignorant of anything materially affecting such a large branch of his business. But it is said the evidence failed to show any taint of wrongdoing in these past and completed contracts and presumably they were lawfully awarded. I grant it. All the more likely then would the unusual and illegal features of the contracts here involved have invited the attention of the experienced contractor who was to profit so largely because of them. The evidence objected to was therefore, as I think, clearly competent and if so it is not important to discuss or consider the particular reasons urged to persuade the trial judge to receive it.

There remain the assignments of error complaining of the manner in which the court in banc disposed of the motion for a new trial. They rest on matters outside the record of the trial. They have been fully discussed in the majority opinion. As the case must be tried again I have no desire to express my own views further than to say that I think the defendants should have been permitted to have the sworn testimony of those who had made reports to the district attorney concerning the conduct of the jurors during the trial. That testimony would furnish a more satisfactory basis for action by the court below and for the review of that

action by an appellate court than mere ex parte statements neither signed nor sworn to by any responsible person.

If I could control the disposition of this case I would hold that the record discloses no reversible trial errors; that the verdict was supported by the evidence, but that the motion for a new trial was not properly disposed of.

I would set aside the sentence; reinstate the motion for a new trial and remit the record to the court below with direction to hear the evidence which the learned district attorney felt his duty required him to suppress, and then dispose of the motion.

President Judge RICE joins in this dissent.[1]

---

[1] For concurring opinion in this case see 57 Pa. Superior Ct. 128.